S. A. D. MURPHY, Administrator Estate of LUKE FLETCHER, v. WABASH RAILROAD COMPANY, Appellant.

In Banc, May 13, 1910.

1. **HUMANITARIAN RULE: An Accepted Doctrine.** The humanitarian doctrine—namely, that, notwithstanding the injured party is guilty of contributory negligence in being on a railroad track, yet the company cannot kill him with impunity, and must respond in damages, if it saw, or by the exercise of ordinary care could have seen, his peril, in time, by the use of ordinary care, to have avoided injuring him—is firmly fixed in the jurisprudence of this State, and has been an accepted doctrine for two generations.

2. ——: ——: **Exceptions.** The humanitarian rule is somewhat of an exception to the general rule of law making an injury that is the joint product of negligence of the tortfeasor and of the contributory negligence of the injured party not actionable. But this concession does not militate against the soundness of the exception. Exceptions are allowed to many general rules, even to express statutes. They but declare the rule itself. An exception which confirms the law expounds the law.

*Held,* by WOODSON, J., dissenting, that the humanitarian doctrine is unsound, inhuman and a misnomer; that it induces people to expose themselves to great danger by inviting them to walk upon railroad tracks, impedes commerce and travel, and thereby increases accidents and waste of property; that it forces the law-abiding traveller to suffer inconvenience and run the risk of accident for the wrongful acts of the trespasser; that, as to railroad tracks, it is in violation of an express statute, and encourages law infraction; that the holding by the courts that a continued use by the public of the track, without objection by the company, amounts to an implied license or a waiver of the trespass denounced by the statute, is, in effect, (1) the carving out of one public highway for pedestrians in another public highway dedicated to railroad uses, and that (2) in the face of the fact that a railroad company cannot by express grant create such a highway over its tracks, nor the public acquire it by prescription or adverse possession, that acquiescence on the part of the company in the public user is a fallacious and unwarranted assumption, because it is impossible for the company, either by armed resistance, because of the immense cost and the lack of authority in guards to make arrests, or because of the utter insufficiency of notice, to prevent pedestrians from using the track; and that the primary duty of the engineer is to look out for the safety of his passengers and train, and if he must attend to ringing the bell, sound the whistle or stop the train to avoid injury to a trespasser, as the humanitarian rule requires him to do, he must neglect his primary duty, and his mind becomes disconcerted and confused, and the safety of passengers is jeopardized and the danger of accident increased.

3. ——: **Drunkenness.** Because the injured party was drunk at the time he was injured is no excuse for negligently injuring him. The fact that the pedestrian, while in drunken oblivion, put himself in peril by lying down on defendant's railroad track, did not authorize defendant's servants to run their train over him, where there was a duty to look, and when by the

exercise of ordinary care they could have seen him in ample time to have avoided the injury. Nor was his drunkenness the proximate cause of his injury.

*Held*, by WOODSON, J., dissenting, that if the engineer should wilfully or wantonly run his train over one, who in a, drunken stupor lies down on the track, he would richly deserve criminal prosecution; but to hold the railroad company liable in damage, and thereby suspend the law of contributory negligence, is a shocking injustice.

4. ————: **Statute: Trespasser: Licensee.** Where the railroad track by common custom, well established and acquiesced in, has long been used by the public as a footway, the presence of pedestrians thereon is naturally to be expected, and it is the duty of those in charge of trains passing over the track at such places to keep a lookout for them, and the statute which declares those not connected with the railroad to be trespassers if they walk on the track, etc., does not bar a recovery in such case.

5. **NEGLIGENCE: Humanitarian Rule: Licensee: Duty to Look: Drunkenness: Demurrer.** Deceased, fifty years old, once employed by defendant as a section foreman at Kirksville, and just prior to the accident, in charge of a section of the road seventy-five miles further north, in Iowa, was temporarily visiting in Kirksville. He had indulged in liquor and between eight and nine o'clock of July 6th was seen to stagger as he walked as if drunk. About nine o'clock, with tangled feet and uncertain steps, he stepped on the track, and sat down near a switch-stand three blocks south of the station, on a tie, close to the east rail, his legs east of the rail, the upper part of his body on and over the rail, his left elbow on the rail, and his head resting in his hand, supported above the track by the elbow resting on the rail, his face turned northward; and while in that position, about fifteen minutes after he sat down, a light north-bound passenger train, running on schedule time, from twenty to twenty-five miles an hour, struck and killed him. The track at the point of the accident was on an embankment or fill, being, by its slope, about fifteen feet above the natural surface, and was ballasted, between the rails and from two to three feet on either side, with burnt red clay, thus affording a background of color to sharply bring out to the eye an object on the track. Beginning 2000 feet south of the accident the track was on slightly up-grade, and a man lying on the east rail in the blazing July sun, would be in plain view of an engineer at his post of duty on the right side of a north-bound engine for 2000 feet, there being nothing to obstruct his view, and there was testimony that the engineer was at his post

of duty and looking directly towards deceased as his engine approached. The place of accident was fifteen feet from a switchstand, which it was the duty of the engineer to see, if signals were given there; the depot was three blocks north, and the engineer would be expected to keep the track leading to that depot under his eye; and one hundred feet north of the switchstand, was a street crossing, to be watched. For a good distance, north and south of the accident, the track had been used for a long time, with the tacit acquiescence of the defendant, by the inhabitants in going from one part of the town to the other, and especially was it so used of mornings, noons and evenings. This custom had gone on for many years, and no attempt was made to show that defendant ever took any steps to prevent the open, continuous and extensive use by the public. The train could have been stopped in 350 feet. Defendant put in no evidence, and the engineer and fireman did not testify. *Held*, first, the engineer had no right to expect a clear track at the point of the accident; *second*, it was the duty of defendant's servants to use ordinary care to discover the peril of deceased; and, *third*, there being evidence that by using ordinary care they could have discovered his peril in ample time to have stopped the train before it struck him, a demurrer to the evidence was properly overruled.

*Held,* by WOODSON, J., dissenting, that the license to the public to use the track was to walk upon it and along its centre, according to known usage, and not to lie down upon it, and especially not to sit down or lie down outside its rails; and as deceased was sitting down or lying down outside of the limits to which the license applied, he was a trespasser, and he cannot complain of the failure of the engineer and fireman to discover him, and as there was no evidence that they actually saw him until it was too late to avoid striking him, there can be no recovery.

6. JUDGMENT: General: Two Items: No Objection Below. Where defendant by answer to the second count of the petition confessed it owed the plaintiff section man $59.30 for wages due, and the jury returned a verdict for $8000 on the first count asking for damages for personal injuries, and the court entered one general judgment for the total, and defendant did not in its motion for a new trial or in arrest, call the attention of the trial court to the irregularity, it will not be considered on appeal.

7. EXCESSIVE VERDICT: Act of 1905: Matters of Aggravation or Mitigation. Whether or not the jury, under the new Damage Act of 1905, which permits them in their discretion to assess the damages in case of negligent death at any sum between two and

ten thousand dollars, should have taken into consideration matters of aggravation or mitigation, will not be considered where plaintiff's instruction given on the measure of damages was couched in the general language of the statute, and defendant asked for no modification of that instruction so as to include specific and definite directions. Mere non-direction is not a ground for complaint.

8. ———: ———: ———: **Compensation.** Whether or not the Damage Act of 1905 contemplates a theory of compensation based on the value of the life of the person negligently killed, and whether or not the minimum amount mentioned in the statute is alone baldly and nakedly penal, and the discretion of the jury to exceed that sum is to be gauged on the theory of compensation, as pecuniary loss, or, if not that, as having regard to the aggravating or mitigating circumstances of the individual case, are not considered in this case, because (1) no instructions were asked containing any such theory, (2) the jury had facts before them from which they could reasonably infer the worth of deceased as a citizen, and (3) the circumstances of aggravation and mitigation were fully developed in the evidence.

Appeal from Knox Circuit Court.—*Hon. Chas. D. Stewart,* Judge.

AFFIRMED.

*Jas. L. Minnis* and *Jones, Jones, Hocker & Davis* for appellant.

(1) This case does not fall within what is known as the humanitarian doctrine of this court. Ayres v. Railroad, 190 Mo. 228; Frye v. Railroad, 200 Mo. 377. The duty of the engineer to keep a lookout under the doctrine as here defined arises from a supposed invitation and license to walk upon the track, acquired "by the tacit consent and long acquiescence of" the company "in permitting open, known, free, continuous and extensive use of the track by footmen." The character and extent of the license, according to the language of the court, is limited by the previous known use made of the track with the acquiescence of the company.

The doctrine does not enjoin upon the engineer the duty to look out for a person on the track unless the use of the track the person is enjoying at the time is a known use previously acquiesced in by the company. Trigg v. Transit Co., 215 Mo. 521. The evidence shows that deceased was lying on the east end of a tie and over on the east rail, and therefore some distance east of the path between the rails used by the public as a footpath. The cases we have mentioned differ only in theory. The duty of the engineer to keep a lookout for a given person using the track, according to all the cases, arises from, is limited by and only commensurate with, his knowledge or presumed knowledge of an extensive and customary previous similar use of the track by the public at the same place and time. (2) The presence of deceased on the track, and his inability to discover the train and get out of its way after the engineer failed to observe him and stop the engine, were not excusable, because brought about by his own voluntary drunkenness, which in law was the proximate cause of his death. Under this rule the contributory negligence of deceased was obviously the proximate cause of his death. 1. Because deceased was not in peril. If we assume deceased was sober, the case is this: An adult person in possession of all his faculties went upon the private right of way of the railroad, sat down upon the end of a tie, and lay with his head over the rails, shortly before a train was due, and was thereby struck and killed. Assuming that deceased was sober and at himself, what purpose must be attributed to him in assuming that position on the railroad track? He had been a section hand and knew trains passed upon the track and that he could kill himself in that way, and that he would be killed unless he moved to a place of safety. We must presume, if deceased "be dealt with as if sober," that he intended the natural and probable consequences of his act in taking that position. He remained there until he was struck and

killed. Had he been sober at the time, a conclusive inference of law, as well as an inevitable inference from the facts, would compel us to say he took the position above described and remained there with deliberate intent to kill himself, and by that means actually committed self-murder. He must be deemed to have known the train was approaching, because he must be deemed to have intended to be killed by the train. He was not, therefore, at any time in peril—that is, unaware of the approach of the train. 2. Because, if "dealt with as sober," deceased, after he knew the engineer had failed to discover him and stop the train, refused to get out of the way and thus rescue himself. Welty v. Railroad, 105 Ind. 55; Strand v. Railroad, 31 Am. and Eng. Railroad Cas. 54. 3. Because deceased's failure to rescue himself must at least be regarded as a concurrent cause of his death. Guyer v. Railroad, 174 Mo. 344; Van Bach v. Railroad, 171 Mo. 338; Tanner v. Railroad, 161 Mo. 497; Holwerson v. Railroad, 157 Mo. 216; Sims v. Railroad, 116 Mo. App. 578; Cahill v. Railroad, 205 Mo. 393; Sissel v. Railroad, 214 Mo. 515. 4. After an exhaustive research, we have been unable to find a single text or decision wherein it has been laid down that a drunken person injured on a railroad track may recover damages on the ground that the engineer failed to be on the lookout. The text writers and cases all hold that in such a case the intoxication of the injured party will be regarded as the proximate cause of the injury. Beach on Contrib. Neg. (2 Ed.), sec. 391; 3 Elliott on Railroads (2 Ed.), sec. 1265, f; Thompson on Negligence, 450; Railroad v. Parthurst, 36 Ark. 371; Railroad v. Simpkins, 64 Tex. 615; Smith v. Railroad, 78 S. W. 556; Bozwodofskie v. Railroad, 20 S. W. 872; Railroad v. Harris, 53 S. W. 559; Beddenberger v. Transportation Co., 18 S. W. 970; Kean v. Railroad, 61 Md. 154; Railroad v. Hutchison, 47 Ill. 408; Maguire v. Railroad, 115 Mass. 239. (3) What is known as the humanitarian doctrine of this court is contrary to

sound public policy, a statute of the State, the text-writers, and practically all the adjudged cases in other jurisdictions, and in the interest of public safety should be abandoned. 1. It is contrary to public safety. Our opposition to it begins and ends with the above statement. If the doctrine is conducive to public safety, then we have no objection to it. Under it the public not only have a right to use the track as a footpath, but it is the duty of the enginemen to look out for and rescue them. The doctrine then vouchsafes to our citizens generally: (a) the right to walk upon the track; (b) protection from the trains while so doing. The people acquire knowledge that they possess these rights from the decisions of the courts. While they do not read the opinions of the courts, they acquire a knowledge of them from the result of cases coming within their observation. The trial of a case against a railroad company for killing a person while walking on the track excites general attention. The people watch for the result of the trial. They learn from the result of the cases that they possess the above rights. The question then is whether the possession of these rights by the public, with the knowledge that they possess them, tends to encourage persons to walk upon railway tracks? If they have the right to walk upon the tracks, free from interference by trains, it would seem they could safely do so. If they have the right to walk upon the track in safety, what reason can be assigned why they should not and would not naturally enjoy that right? To say that the doctrine which vouchsafes to the public a legal right to walk upon railroad tracks without incurring peril from trains, will not encourage and induce persons to walk upon the track, is not only contrary to the principle underlying our government, but to reason and every man's experience. The great majority of men are restrained from doing things they have no right to do by the mere fact that they cannot lawfully do them. On the other hand they

are tenacious of their rights, and if they have a right
to walk upon the track, and it is the duty of the engine-
men to look out for them, they have the right to as-
sume that they may safely walk upon the track.  2.  If
the law permits persons to walk on the track, it should,
in their interests, require them to look out for them-
selves.  Hyde v. Railroad, 110 Mo. 279; Mulherrin v.
Railroad, 81 Pa. St. 366.  3'. The doctrine is violative
of the rights of the traveling public.  4.  The doctrine
is violative of the rights of the railroad company.  The
court knows as a matter of common knowledge that rail-
road companies are powerless to prevent pedestrians
from walking on their tracks, and the circumstance that
such practice endangers the lives of the trainmen and
passengers excludes an inference that the railroad com-
panies invite them to walk upon the track or consent
for them to do so.  One's consent cannot be implied
from the circumstance that he fails to prevent a prac-
tice which he is powerless to prevent.  Railroad v. Wo-
mack, 84 Ala. 149'; Beach on Contr. Neg., sec. 212; Carr
v. Railroad, 195 Mo. 297.  5.  The doctrine does not
prevail generally in the courts of last resort in other
States, except Texas, and there the contributory negli-
gence of a drunken person on the track will defeat a
recovery.  Caldwell v. Railroad, 117 S. W. 488.  It is
held in the following States that the enginemen are
under no duty to be on the lookout for persons walking
on the track:  Maine:  Coup v. Railroad, 100 Me. 568;
Connecticut:  Nolan v. Railroad, 53 Conn. 461; New
York:  Holmes v. Railroad, 112 N. Y. Sp. 421; New
Hampshire:  Frost v. Railroad, 64 N. H. 220; Pennsyl-
vania:  Gilmartin v. Railroad, 186 Pa. St. 193; West
Virginia:  Huff v. Railroad, 48 W. Va. 45; Alabama:
Railroad v. Linn, 103 Ala. 139; Iowa:  Thomas v. Rail-
road, 114 Ia. 169; Minnesota:  Heffel v. Railroad, 49
Minn. 263; Montana:  Montague v. Railroad, 99 Pac.
690; Mississippi:  Dooley v. Railroad, 69 Miss. 648;
Illinois:  Thompson v. Railroad, 226 Ill. 542; Indiana:

Parker v. Railroad, 134 Ind. 673; Oklahoma: Falley
v. Railroad, 16 Ok. 32; New Jersey: Devoe v. Railroad,
63 N. J. 276; Ohio: Railroad v. Workman, 66 O. St.
509; Michigan: Trudell v. Railroad, 126 Mich. 73;
Massachusetts: Byrnes v. Railroad, 198 Mass. 444;
Kentucky: Burton v. Railroad, 113 S. W. 442; Nebras-
ka: Schultz v. Railroad, 119 N. W. 463; Oregon: Ward
v. Railroad, 25 Ore. 433; Washington: Hamlin v. Rail-
road, 37 Wash. 448; Utah: Palmer v. Railroad, 34
Utah 466; Cannon v. Railroad, 157 Ind. 682; Railroad
v. O'Cannon, 189 Ill. 564-5. These are leading cases.
The Supreme Courts of the following States hold that
while it is the duty of enginemen to be on the lookout,
the failure of an adult pedestrian to keep a lookout
and get out of the way of the train, will defeat a re-
covery: Virginia: Railroad v. Denny, 56 S. E. 321;
Railroad v. Wood, 99 Va. 156; North Carolina: Muse
v. Railroad, 63 S. E. 102; Kansas: Coy v. Railroad,
86 Pac. 468; California: Kenna v. Railroad, 101 Cal.
26; Arkansas: Adams v. Railroad, 83 Ark. 300;
Maryland: Price v. Railroad, 84 Md. 506; Coy v. Rail-
road, 74 Kas. 853; Dyersan v. Railroad, 74 Kas. 589.
Every text-writer we have examined condemns the doc-
trine. 2 Thompson on Negligence, sec. 1711; 3 Elliott
on Railroads (2 Ed.), sec. 1249-1255; Beach on Contrib-
utory Neg. (3 Ed.), p. 296, sec. 201, and pp. 293-5.

*Campbell & Ellison, C. E. Murrell* and *F. H. Mc-
Cullough* for respondent.

(1) A demurrer to the evidence admits every fact
which any of the evidence tends to prove, and also
every fact which the jurors might with propriety infer
from the facts before them, and should be allowed only
when the evidence thus considered wholly fails to make
proof of some essential averment. Noenger v. Vogt,
88 Mo. 592; Fearons v. Railroad, 180 Mo. 220. (2)
There was ample evidence tending to show actionable

negligence on the part of the defendant, and the case was therefore properly submitted to the jury. Morgan v. Railroad, 159 Mo. 262; Fearons v. Railroad, 180 Mo. 208; Scullin v. Railroad, 184 Mo. 705; Eppstein v. Railroad, 197 Mo. 720; Everett v. Railroad, 112 S. W. 486; Ahnefeld v. Railroad, 111 S. W. 95; King v. Railroad, 211 Mo. 1; Frick v. Railroad, 75 Mo. 609. (3) The track of defendant south of the place of the catastrophe for more than 2000 feet, with the knowledge of defendant and its employees, had been habitually used for more than twenty years by a large number of persons. A well worn footpath reached the track at the place deceased sat. The switchstand was only a few feet from him and it was the duty of the engineer and fireman to watch for signals thereon; on account of the numerous persons making use of the track they had no right or reason to expect a clear track, and it was therefore their duty to keep a watchful lookout in order to see if the track was clear, and if they failed to do so, and if the death of Fletcher resulted from such failure, they were guilty of actionable negligence. Sullivan v. Railroad, 97 Mo. 119; Holden v. Railroad, 177 Mo. 456; Authorities supra. (4) The evidence tended to show the engineer saw Fletcher in ample time to have saved his life by the exercise of ordinary care. Rine v. Railroad, 100 Mo. 228; Reyburn v. Railroad, 187 Mo. 565; Eppstein v. Railroad, 197 Mo. 720; Lynch v. Railroad, 208 Mo. 21; Donohue v. Railroad, 83 Mo. 543. The court gave proper instructions on behalf of the plaintiff and those requested by the defendant and refused were properly refused. Woods v. Railroad, 188 Mo. 229; Morgan v. Railroad, 159 Mo. 283. It was the duty of the engineer and fireman when operating a train through a populous city and across its streets to be on the lookout. Authorities supra. (5) The negligence of deceased under the facts in the case does not bar a recovery. Werner v. Railroad, 81 Mo. 369; Ropp v. Railroad, 190 Mo. 161; Siles v. Knott, 197 Mo.

708; 1 Thompson, Neg., sec. 240.   (6)   Appellant is in no position to complain on account of the humanitarian doctrine. It certainly does not place too great a burden on a railroad nor on any person and it applies to all alike. A man driving a wagon along a highway and a railroad running its trains are charged with exactly the same duty. We all are bound to expect the things that ordinary care and prudence teach us are true, and being so bound, the law requires that we govern ourselves accordingly. The humanitarian doctrine merely punishes those who fail to exercise ordinary care and by reason of such failure kill and injure the helpless and unwary. Without making an exhaustive research to ascertain the number of cases sustaining the doctrine we desire to call the court's attention to the following, wherein it has been approved:—By Woodson, J.:   Everett v. Railroad, 214 Mo. 54; Trigg v. Company, 215 Mo. 521.  By Valliant, J.:   Morgan v. Railroad, 159 Mo. 262; Ayers v. Railroad, 190 Mo. 228. Lamm, J.:   Frye v. Railroad, 200 Mo. 377; Hinzeman v. Railroad, 199 Mo. 56; Eppstein v. Railroad, 197 Mo. 720.   Gantt, J.:   Scullin v. Railroad, 184 Mo. 695; Lynch v. Railroad, 208 Mo. 1.  Fox, J.:  Sites v. Knott, 197 Mo. 684; Fearons v. Railroad, 180 Mo. 208; Ahnefeld v. Railroad, 212 Mo. 280.   Graves, J.:   Hufft v. Railroad, 222 Mo. 286; Spencer v. Company, 222 Mo. 310; Hall v. Railroad, 219 Mo. 553.  Burgess, J.:  Kreis v. Railroad, 131 Mo. 533; Waddell v. Railroad, 213 Mo. 8; Schlereth v. Railroad, 115 Mo. 87.  Henry, J.:  Harlan v. Railroad, 65 Mo. 22; Hecks v. Railroad, 65 Mo. 34.   Hough, J.:   Frick v. Railroad, 75 Mo. 595.   Norton, J.:   Scoville v. Railroad, 81 Mo. 434.   McFarland, J.:  Sinclair v. Railroad, 133 Mo. 233; Chamberlain v. Railroad, 133 Mo. 587; Fiedler v. Railroad, 107 Mo. 645;   Bunyan v. Railroad, 127 Mo. 12.  Brace, J.: Guenter v. Railroad, 95 Mo. 286.  Black, J.:  Williams v. Railroad, 96 Mo. 275.  Thomas, J.:  Guenther v. Railroad, 108 Mo. 18; Lynch v. Railroad, 111 Mo. 601.

Sherwood, J.: LaMay v. Railroad, 105 Mo. 361. The evidence in this case shows that the greater part of deceased's body was on top of the rail and that he was plainly visible for more than 2000 feet. Persons were wildly running down the track towards the scene of the accident and a negro woman standing beside the track was excitedly waving her handkerchief in warning to the engineer. Persons at the depot 2000 feet north could readily see the deceased, and the engineer was the only person connected with the whole affair who could not distinguish the situation as it existed. Common prudence, and experience which undoubtedly the most of us have had, teach us that an engineer, if he is exercising care, a large part of the time has his eye on the rails of the track. He may possibly have mistaken deceased for some other object, he may have seen him and supposed that he would leave the track; undoubtedly his eyes were as good as the eyes of other persons and he must be presumed to see as much as any other ordinary man could or did. Suppose, for argument, the object upon the track had been a log, a rock or a tie. Would any court or jury say that the engineer, if he exercised care, could not have discovered the situation in time to have avoided wrecking his train. So, therefore, if the engineer was bound to anticipate the presence of persons upon the track, the attitude of a person, so long as he was plainly visible to the engineer, would make no difference. User created the duty to look, and the duty existing, it was negligence to not see what could have been seen by him for a mile.

LAMM, J.—Luke Fletcher was fifty years old. On the sixth day of July, 1905, he was defendant's servant as section foreman in Iowa. On that day he was struck on defendant's track by one of defendant's locomotive engines pulling a light passenger train within the corporate limits of Kirksville in Adair county, Mis-

souri, and was so hurt that presently he died. Though once married, he was unmarried at his death, leaving no minor children, "natural or adopted," but leaving one son, who had reached his majority, surviving him. Presently Mr. Murphy was appointed administrator of his estate, took on himself the burden of that trust by qualifying, and sues defendant in two counts—the first, to recover $10,000 for Fletcher's wrongful and negligent death; the second, to recover a small remnant of wages due decedent as section foreman.

At the trial defendant confessed in open court the allegations of the second count to be true, and that the administrator was entitled to recover the amount sued for, to-wit, $59.30. The trial progressing only on the first count, the second needs no further consideration.

The first count of the petition is a full and elaborate pleading, and may be characterized as predicated on the right to recover for the wrongful and negligent death of Mr. Fletcher on the humanitarian theory. To that end, it charges that he was on defendant's main track in the city of Kirksville at a place where, from long and common use by footmen in going north and south in said city, with knowledge and acquiescence of defendant, it had no right to expect a clear track; that such condition raised a duty to keep a lookout for persons so using the track and exposed to danger; that defendant negligently ran its locomotive and train against decedent and fatally injured him; that its servants and agents in charge of said locomotive and train saw, or by the use of ordinary care might have seen, him in peril in time to have stopped the engine and saved his life, but negligently failed to keep a watchful lookout for persons who might be in peril ahead of the engine on the track, or negligently failed to stop said engine after they knew or should have known of defendant's danger, when by the exercise of ordinary care they could have discovered it in time to have saved him.

There is another theory of the petition upon which a right to recover is predicated, *viz.*, that, place and time considered, the train should have been run at such low rate of speed that it would be under control and could be quickly stopped. That, in breach of that duty, the train killing Fletcher was negligently and carelessly run at twenty-five miles an hour and not under control. But, as the case was not put to the jury on this theory, it is afield.

The answer was a general denial, coupled with a plea of specified contributory negligence, in that decedent was negligently. lying down upon defendant's track and remained there without looking or listening for the approach of trains, when by looking he could see, or by listening he could hear, their approach in time to have saved himself, and without exercising any care whatever for his own safety; that his death was solely the result of his own negligence in lying down upon the railway track of defendant, not at the crossing of any public highway, in open and express violation of section 1105 of the Revised Statutes of Missouri.

No reply was filed, but as we have uniformly held that if a trial proceeds as if the new matter in the answer was put in issue by denial in a reply, one would be taken as filed, this phase of the case may be put aside.

The facts will appear in the opinion.

Defendant called no witnesses and put in no evidence. The plaintiff, among other witnesses, called the conductor of the train, but his testimony was of no probative force one way or the other. Neither the engineer nor the fireman was on the witness stand.

The case was put to the jury on behalf of plaintiff in four instructions, only two of 'which are material on appeal, *viz*:

"1. In behalf of the plaintiff the court instructs the jury that if you find and believe from the evidence,

that on the 6th day of July, 1905, the defendant operated a railroad, running through the corporate limits of the city of Kirksville, Adair county, Missouri, and that said railroad crosses from south to north at about right angles, among others the following named streets in said city of Kirksville, and in the following order, to-wit: Michigan, Wilson, Dodson, Water, Filmore, Scott, Pierce and Jefferson, and that on said 6th day of July, 1905, and continuously for several years prior thereto, defendant's said railroad track, from the place where it crosses said Jefferson street to a point two thousand feet south of said crossing, with the knowledge of the defendant, was used and treated as a thoroughfare by a large number of persons, not employees of defendant, who were in the habit of walking to and fro thereon, in the same manner and with the same freedom as if said railroad track had constituted a highway of said city.

"And that upon the 6th day of July, 1905, Luke Fletcher was upon defendant's said railroad track, at a point between said Scott and Filmore street, and was in a dangerous and perilous position, and in imminent peril of being struck by defendant's train, and defendant's employees in charge of said train became aware of his perilous position in time to have enabled them, by the exercise of ordinary care, to have stopped said train, and to have averted injury to said Luke Fletcher, or if the jury believe from the evidence that said employees in charge of said train, by the exercise of ordinary care, could have become aware of the perilous position of said Luke Fletcher on defendant's said railroad track, if the evidence shows said Luke Fletcher was in a perilous position, in time to have stopped said train, and to have averted striking said Luke Fletcher, and that they failed to exercise said care to stop said train, and that by reason of such failure to exercise such ordinary care, the said train was not stopped, and that said Luke Fletcher was struck and killed

by said train on July 6, 1905, and that on said 6th day of July, 1905, said Luke Fletcher was an unmarried man, and left no minor child or children surviving him, and

"That on the 17th day of July, 1905, the probate court of Adair county, Missouri, appointed S. A. D. Murphy administrator of the estate of said Luke Fletcher, and that said S. A. D. Murphy duly qualified as said administrator and has since been acting as such, then you will find for the plaintiff in a sum of not less than two thousand dollars nor more than ten thousand dollars. Although you may further believe that said Luke Fletcher was guilty of negligence in going upon defendant's track.

"And by ordinary care, as used in this instruction, is meant such care as an ordinarily careful or prudent person or persons would exercise under the same or similar circumstances.

"2. If the jury believe from the evidence, that at the point on its track, where Luke Fletcher was struck and killed by defendant's train, if you find he was struck and killed on defendant's track by one of defendant's trains, said track was clear and unobstructed and sufficiently straight to permit a plain view along the track, from any approaching train;

"And if the jury further believe that at said point where said deceased was struck by the train, the roadbed of defendant both north and south of said spot, was at that time used, and had for a long time prior thereto, been used, with the knowledge of defendant, its servants and employees, by pedestrians as a passway leading to and from the business portion of said city of Kirksville, then it was the duty of the employees of the defendant in charge of the train, when approaching such portion of the roadbed of defendant as was used as aforesaid as a passway, to keep a lookout for persons, and to ascertain that the track was clear."

On behalf of defendant the court instructed the jury as follows:

"1. The court instructs the jury, that if they shall believe from the evidence that the deceased, Luke Fletcher, was sitting or lying on or near defendant's track, at the time he received the injuries of which he died, then in such case the deceased, Luke Fletcher, was a trespasser and was guilty of negligence.

"2. The court instructs the jury, that if they believe from the evidence that the deceased, at the time he received his injuries was sitting on the ends of the ties of defendant's track, he was in so doing guilty of negligence, and the fact that he was intoxicated, if such was the fact, did not relieve him from the duty of exercising ordinary care for his own safety.

"3. The jury are instructed that in considering what their verdict should be they must not in the slightest degree be influenced by any feeling of sympathy, or the relative condition of the parties to the suit, but must lay aside all such feelings and be governed solely by the evidence as they have heard it in the trial, and the law as contained in the instructions.

"4. The court instructs the jury, that if they believe from the evidence that the deceased was sitting on the ends of the ties, at and shortly before he was struck by the engine, then plaintiff cannot recover on the ground that the bell was not rung or the whistle sounded, even if the jury believe that the bell was not rung and the whistle was not sounded."

The following instructions were refused to defendant:

"5. The court instructs the jury, that although they may believe from the evidence in the cause, that pedestrians were in the habit of walking along defendant's railroad track, at the place of the accident, and that the railroad officials knew of such use of the track and consented to it, at and prior to the time Luke Fletcher was struck and killed; yet if the jury shall

further believe from the evidence, that the said deceased was neither walking nor standing upon the track, at and just before he was struck and killed, but was sitting or lying upon the track, then he was a trespasser and the defendant's engineer was not bound to be on the lookout for him.

"6.  The court instructs the jury, that if they believe from the evidence, that the injuries and death of deceased, Luke Fletcher, were caused by his own negligence, they will find for the defendant.

"7.  The court instructs the jury that although you may believe from the evidence, that the defendant's railroad track, at the place where the deceased, Luke Fletcher, was struck, had been used by the public as a footway to such an extent that the engineer in charge of the train ought to have kept a sharp lookout to discover persons walking thereon, yet he was under no obligations, and was not required to keep a lookout to discover persons lying on the track, and if you believe from the evidence, that the deceased, Luke Fletcher, was so lying on the track, then he was a trespasser under the law, and the defendant is not liable in this case, and your verdict should be for the defendant."

In addition to the above, the court refused to peremptorily instruct, on defendant's prayer, that under the pleadings and evidence the verdict must be in its favor.

A verdict, eleven jurors signing, was returned in the sum of $8000.  On this verdict, a general judgment was rendered in favor of plaintiff—*i. e.,* one for $8000, plus the amount confessed as due for wages on the second count.

Errors are assigned in the giving and refusing of instructions.  It is contended, further, that the cause should be reversed because one general judgment was rendered on a general verdict.  In other words, that the verdict should have been on both counts of the peti-

tion. Finally, it is argued that the verdict is excessive.

I. Was it error to refuse the peremptory instruction?

The question involved seeks the sufficiency of the evidence to make a case and calls for the facts. They lie in a small compass. Assuming Fletcher's age, employment and death, leaving no widow or minor children, together with the appointment of Murphy as administrator, as already said, then the case made on the other facts follows: It seems Mr. Fletcher, once employed by defendant as section foreman in Kirksville, at the present time was in charge of a section of the road some seventy-five miles north, in Iowa, and was temporarily visiting in Kirksville. Whether exuberance incident to the visit, or to the celebration of the Fourth of July, just over, induced over indulgence in liquor, is dark. There is no testimony indicating he was habitually in his cups. He had been in defendant's employ for more than a generation and that fact weighs down and drowns such hypothesis. There is uncontradicted evidence tending to prove that from eight to nine o'clock of July sixth, he was seen to stagger in gait as if drunk. The doctor attending him after his hurts says he was in liquor. Absent testimony pointing to a falling sickness or other ailment, explanatory of his conduct and condition, we shall assume he drank himself drunk and in a drunken stupor lay down on the rail.

Kirksville is city of, say, 8000 souls. Defendant's main track there runs north and south and cuts the town in two. Northeast of the *locus in quo* is the principal part of the town. Southwest and south 2000 townspeople live. The accident was close to a switchstand. From that point south, for 2000 feet, defendant's track was a tangent, on an up grade of two and one-third inches to the one-hundred feet, and with no

obstruction to interrupt the vision. The track was ballasted between the rails and from two to three feet on either side with burnt red clay, thus affording a background of color to sharply bring out to the eye an object on the track. Commencing north of the *locus* and running for 1000 feet south, the track was on a fill, about 15 feet from the crown to the nose of the slope, and at the place of the accident the fill was from four to six feet on a perpendicular above the natural surface of the ground. At about 9 a. m. on the day in hand, the track on that fill lay under the blazing eye of a July sun, and a man lying on the east rail of it would be in plain view of an engineer at his post of duty on the right hand side of a north-bound engine for 2000 feet. Not only so, but there is evidence that the depot lay about three blocks north of the switch-stand and an engineer would be expected to keep the track approaching that depot under his eye. Not only so but signals were used at the switch-stand which it was the duty of the engineer to see, and which switch-stand was, say, fifteen feet from where Fletcher got his death. There was also a street-crossing a hundred or so feet north to be watched. Commencing north of the switchstand a little ways and running for a thousand feet south, several east-and-west streets of the city abutted against defendant's track on either side. Whether they were platted on paper as crossing the track, we do not know, but the testimony shows that vehicles in those *cul de sacs,* or·broken streets, did not pass from east to west over the tracks.

There was uncontradicted evidence put in tending to show that defendant had no right to expect a clear .track from the point of accident south and north for a good distance. Its track there was used for a long time, with its tacit acquiescence, by the inhabitants of Kirksville going from the southwest and south parts of the town to the northeast where the principal business section lay and *vice versa.* Especially was this

·so mornings, noons, and evenings. This custom had gone on for many years and no attempt was made to show that defendant took any steps to prevent such open, continuous and extensive use by the public.

The details of the testimony on the point are omitted partly because we do not construe defendant's brief as seriously contending that, under the doctrine of a long line of cases in this court, there was no such public user shown as would raise a duty on defendant to run its train as if the presence of persons on the track was to be expected. To the contrary, defendant's position is that (conceding the public user) the reasoning in that line of cases is unsound, and that our former interpretation of the provision of section 1105, Revised Statutes 1899, relating to trespassing by walking on the track under given conditions, is unsound.

Decedent was seen walking with tangled foot and uncertain step on the track shortly before the northbound passenger train was due. Presently, he sat down and then took one position and another as if to sleep. For ten or fifteen minutes before he was struck his position is described as recumbent, viz: He was seated, apparently on a tie close to the east rail, one elbow was on that rail, his legs and the lower trunk of his body were east of the rail. The upper parts of his body were on and over the rail, and his head lay in the palm of the hand, supported above the track by said elbow resting on the rail. In that condition of things, defendant's north-bound train, running twenty or twenty-five miles an hour, struck and killed him. There was evidence tending to show that no alarm was given by bell or whistle, and that the emergency air was not put on till the instant of collision, but there is no fact in the case from which a natural inference could flow that signals would have done any good to the unconscious man. The attitude of the man would indicate to any onlooker that he was asleep or otherwise unconscious. His face was not turned towards

the approaching train. The station signal had been given at the whistling post but, we infer, no crossing signals were given at city streets crossing the tracks between the post and the switchstand but the remarks made on alarm signals apply here.

Fletcher was five feet ten inches in height, and weighed one hundred and eighty pounds. There was testimony tending to show that a colored woman had been calling to him, while he was lying on the rail, to get off. Some testimony shows that, failing to get him off, she waved a handkerchief at the approaching train. We infer that she took her stand at the foot of the slope of the fill, which would place her some distance away. There was also testimony tending to show that the engineer was at his post of duty and looking directly down towards Mr. Fletcher as his engine approached. Other evidence showed the train could have been stopped in 350 feet.

On such record, we are of the opinion that the refusal of the peremptory instruction was well enough. This because:

(a) In an eloquent and powerful argument at our bar and in a brief of point and force counsel deliver a set attack on the humanitarian doctrine. To feather one arrow aimed at it, it is argued in effect, that instead of being humane it faces the other way, for that it opens a new door to the destruction of life and limb by inviting or encouraging the use of railroad tracks by footmen. If the long and appalling inventory of injuries and deaths on railroad tracks is to be traced to bad doctrines formulated and announced by this bench, then indeed it has much to answer for. But learned counsel, we think, by inadvertence unsoundly argue in that behalf. It may well be doubted if a single person, within the memory of a man now alive, ever walked on a railroad track in Missouri, or refrained from walking there, solely because of any decision made by this or any court on any phase of

the law of negligence. Hitherto it has been the generally accepted notion that to hold railroad companies to strict inquest and just accountability when a child or adult is killed or maimed, conduces to care and caution in the management of death-dealing machines at places where people are permitted by the owners of such machines to be expected. But we have no imperative call at this late day to defend that doctrine. It has been criticised on one hand and defended on the other by text-writers. It is not alone the doctrine of this court, but it is a working rule in other appellate courts of entire respectability (*Vide,* 1 Shear. & Redf. on Neg. (5 Ed.), sec. 99, and notes; 2 *ibid.,* sec. 484 and notes). It has been a favorite doctrine of this court for two or three generations.

So early as 1875, in Isabel v. Railroad, 60 Mo. l. c. 481, through WAGNER, J., we said: "No doctrine is better established in this State than the principle it enunciates. Our decisions have been uniform, that although a person may be improperly or unlawfully on the track of a railroad, still that fact will not discharge the company or its employees from the observance of due care, and they have no right to run over and kill him, if they could have avoided the accident by the exercise of ordinary caution or watchfulness."

In 1884, in Werner v. Railroad, 81 Mo. l. c. 374, HENRY, J., speaking, said: "Counsel indulges in a criticism of the cases in which this court has held that if the negligence of a defendant which contributed directly to cause the injury, occurred after the danger in which the injured party had placed himself by his own negligence, was, or by the exercise of reasonable care, might have been discovered by the defendant, in time to have averted the injury, then defendant is liable, however gross the negligence of the injured party may have been in placing himself in such position of danger. Such is the well-established doctrine of this court."

Over and over again the doctrine has been assailed at the bar as illogical, and sustained by this bench as a logical and a humane rule producing wholesome results in the administration of justice. The decisions have not always employed the same line of reasoning in its support. So, cases may be found that depart from the doctrine (*e. g.,* Holwerson v. Railroad, 157 Mo. 216), but this court has consistently either walked in the path of that rule or has sooner or later come back to that path if departed from. In the light of our later decisions holding a single and no uncertain voice in that behalf, to defend the rule by marshaling anew the reasons underlying it, is but to admit it needs defense, and we leave it with some observations, *viz.*: (1) It is too firmly rooted in the jurisprudence of this State to be overturned by anything short of an act of the law-making power. (2) It may be admitted that it has been applied now and then where the maxim, The nearest cause and not a remote one should be attended to, would have been sufficient to solve the problem in hand. (3) And now and then it has been applied in such a way as to apparently squint at the doctrine of "comparative negligence" (a kind of negligence recognized by some courts and lately by an Act of Congress but not indorsed by the courts of Missouri). (4) Again, in some cases, the rule has been put on the idea of willfulness, recklessness or wantonness. This view of it possibly sprang from the proposition that contributory negligence is never a defense against a willful or wanton wrong (1 Shear. and Red. on Neg. [5 Ed.], sec. 64), but in our later cases the humanitarian rule is no longer put on the presence of willfulness or intentional wrong, but is reasoned out from the viewpoint of tender regard for life and limb and the doctrine is applied in cases grounded on negligence pure and simple. (5) Finally it will do to say that the humanitarian rule is somewhat of an exception to the general rule of law making

an injury that is the joint product of negligence of the tortfeasor and of the contributory negligence of the injured party not actionable. But none of these concessions or propositions militate against the soundness of the doctrine. The books are full of exceptions allowed to general rules. Such exceptions readily recur to scholars in jurisprudence and (when established) they become as important and just as the rule itself. To illustrate: take the exception to the general rule of the Statute of Frauds requiring contracts for the sale of real estate to be in writing. And, more in point, take the exception to the statutory rule that railway companies are liable for injuries received by persons at public crossings where no whistle has been sounded or bell rung as imperatively ordained by statute. By judicial construction a main exception has been grafted on the stem of the statute, to the effect that the defense of contributory negligence applies to such cases in full vigor, although the statute limits the defendant to the right to show that a failure to give the statutory signals was "not the *cause* of such injuries." Similarly, the defense of contributory negligence has been applied by judicial construction to actions arising on statutes requiring the owner of dangerous machinery to fence the same, and to mining laws for the protection of life. Many other examples might be given. In fact, exceptions are an ordinary incident to a general rule of law and are allowed so much significance that it may be said: Exceptions but declare the rule itself. *Exceptio quoque regulam declarat.* So an exception which confirms the law, expounds the law.

(b) It is argued that Fletcher drank himself drunk, in drunken oblivion put himself in peril by lying down on defendant's track, that this drunken act of negligence was the proximate cause of his injuries, regardless of the humanity rule. Counsel have

228 Sup—6

diligently searched out and submitted cases sustaining their position.   But this court has never so held. Drunkenness excuses neither a crime nor a negligent act.   So much is clear law.   But at root a drunken man is as much entitled to life or limb as a sober man.   In no system of ethics known to us has A any more right to negligently injure B when drunk than he would have to injure him when sober.   Drunk or sober a man is a man and a brother in the law of negligence. Would it not be a droll and anxious enlargement of the charter powers of defendant corporation to so write the law as to allow it to cut off the life or leg of a toper by its negligent failure to use ordinary care towards him, and at one and the same time so write the law that under like circumstances it would be liable as a tortfeasor if he were sober?   We take it that in right reason the drunkard is dealt with as if sober—no more, no less.   He is held up on his part to the same high-water mark of duty and responsibility —so are those who deal with him.   The woeful list of sorrows and ills flowing from drunkenness is long enough and sad enough without adding new terrors by judicial construction.   Therefore, the operatives of engines and cars, who see (or where, in instances the duty is raised to look, they might see) a person fast in a cattle-guard, or in a hole, or otherwise snared on a track, or down drunk, or otherwise apparently incapable of moving, are guilty of negligence in not making all prudent efforts to avoid a collision, and this regardless of such person's disability. [Beach on Contributory Negligence, p. 302, and cases cited under note 5; 1 Thompson's Com. on Law of Neg., sec. 341.]

In the Werner case, supra, Werner was drunk and down on the track.   Bunyan was drunk (127 Mo. 12). The child, Mary Woods, was fast in a cattle-guard and up and down at intervals.   [Woods v. Railroad, 188 Mo. 229.]   Fearons, in Fearons v. Railroad, 180 Mo. 208, fell into a conduit with possibly only his head and

shoulders showing above the track, and it was held to be the duty of the motorman to see him and save him. Riggs was drunk and lying down outside of the rail with his left leg projecting over it. [Riggs v. Railroad, 120 Mo. App. 335.] In that case it was argued, as in this, that there was no duty to look out for him, but we refused to take that view of the law. If a person is down so close to the track as to be hurt by a passing train, and where, because of the shadows of night or some curve, or some obstruction to vision, his peril cannot be seen by the exercise of due care in watchfulness, in time to avoid injuries to him, as in such cases as Ayers v. Railroad, 190 Mo. 228, or in Trigg v. Railroad, 215 Mo. 521, and Riggs v. Railroad, supra, then a different situation is presented. But such cases are not this case; and for us to hold there is no duty on railroad companies to look for any persons except for those walking upright upon the track, at places where there is a duty to look and to see, would be stumblingly narrow and sour exposition. If drunkards are put outside the rule because down drunk, such holding would exclude from the humanitarian rule those falling in fits, or stricken down by violence, or the child creeping on the track.

(c)  To convict the trial court of error in refusing the peremptory instruction, it is argued that this court has heretofore misjudged and misinterpreted that provision of section 1105, Revised Statutes 1899, reading: "If any person not connected with or employed upon the railroad shall walk upon the track or tracks thereof, except where the same shall be laid across or along a publicly-traveled road or street, or at any crossing, as hereinbefore provided, and shall receive harm on account thereof, such person shall be deemed to have committed a trespass in so walking upon said track in any action brought by him on account of such harm against the corporation owning such railroad, but not otherwise." Counsel say that such statutory provis-

ion requires a person not an employee to be held and taken as a trespasser in walking on the track—no matter whether he would be otherwise technically a trespasser or not. The last step in the evolution of the argument is, of course, that the railroad company owes no duty to look out for trespassers. That provision of written law was painstakingly construed and considered in Morgan v. Railroad, 159 Mo. 262. The conclusion reached was that, construed in the light of reason and our former adjudications, there was left remaining a duty to look out for persons on the track at places where by common custom, well established, and known to the railway company, there was such pronounced use of the track by pedestrians as caused their presence to be naturally expected. In other words, the statute made no innovation on the general rule in that regard, and that general rule of duty, and liability for breach of it, whether relating to trespassers or licensees or *quasi* licensees had long been recognized by this court before the Morgan case. Since its decision it has been consistently and persistently followed.

In a very late case, Ahnefeld v. Railroad, 212 Mo. 280, the present contention of learned counsel was considered and was disallowed on a full and exhaustive review of our decisions. We can add nothing of value to what was said in those two cases, and, admitting ourselves instructed but not convinced by the scholarly briefs of counsel for appellant, we remain satisfied with our former decisions.

Other contentions are made under this head, but we deem them not meritorious. Having pursued the matter far, we announce our conclusion to be that the peremptory instruction was well refused.

II. Error is assigned in the giving and refusing of other instructions. They need no single consideration, because the rulings of the trial court thereon were

in line with the reasoning and holding of paragraph I of this opinion. Accordingly, the assignment is disallowed.

III.    Error is assigned in the form of the judgment. At the trial defendant confessed in open court that the administrator was entitled to recover the remnant of wages sued for in the second count, to-wit, $59.30. No evidence went in on this item and it was not instructed on. The jury returned no verdict on it. But when the court came to render judgment it added the confessed sum to the verdict sum and rendered a general judgment for the total. Defendant did not call the trial court's attention to this irregularity in its motion for a new trial, or in its motion in arrest. The matter does not affect the merits of the case to the size or weight of one mustard seed. A judgment may as well be rendered on confession as on verdict found. It goes as a logical sequence for the amount due, be it established by confession or by trial. We have the right to eliminate the amount of wages and leave the judgment stand on the verdict alone, but, as defendant neglected to present the matter to the trial court, we may not consider it here.

The point is disallowed to defendant.

IV.    Finally, error is assigned for that the verdict is excessive. The point made is novel and under the new Damage Act. [Laws 1905, p. 135.] By that act, section 2864, Revised Statutes 1899, of the old Damage Act, was amended in sundry vital particulars—among others, in the statutory penalty for a death loss in conditions given. The amendment provides that, in case of a death, the corporation, individual or individuals liable for the same "shall forfeit and pay as a penalty, for every such person, employee or passenger so dying, the sum of not less than two thousand dollars and not exceeding ten thousand dollars, at the discretion of

the jury, which may be sued for and recovered: First, by the husband or wife of the deceased," etc.

The contention, as we grasp it, is that there was no evidence tending to show the value of Fletcher's life, that his qualities as a man were not disclosed. That there were no facts in the case upon which the discretion of the jury could take hold, by way of mitigation or aggravation, so as to gauge the penalty on the sliding scale from two to ten thousand dollars as written in the amendment. That, therefore, decedent's administrator was entitled to recover only the minimum amount of the statutory penalty, to-wit, $2000, and all above that sum must be taken as excess. This new act introducing legislative innovations of a far-reaching character, its exposition should be attended with judicial caution in order not to press its words too far and divert the law from its prescribed statutory channel. For, as said by Coke: "If a river swells beyond its banks, it loseth its own channel." Neither ought the words be pressed too tightly, so as to squeeze the life out of the law. In one permissible view of the new statute (and the one most obvious) it is penal and nothing else. The law-makers said so. But when the whole statute is read and harmonized it might appear (by construction) that the minimum amount is left alone as nakedly and baldly penal, and that the discretion of the jury to go above that amount might be gauged on the theory of compensation, as pecuniary loss, or, if not that, as having regard to the aggravating or mitigating circumstances of the individual case. "The law," says Dr. Johnson, "is the result of human wisdom acting on human experience for the benefit of the public." This is a lay view of it. Technically, and at end, the law is what it is judicially construed to mean. In that view, the construction of a statute becomes part of it. Accordingly, we count it wise to reserve the question as to whether the statute involves only a penal, or both

a penal idea and one of compensation, or of aggravation or mitigation, since those large and vital questions are not briefed by learned counsel and should not be passed on finally without the illuminating aid of full briefs.

We disallow the assignment and put our disallowance on the grounds: *First,* that if the statute contemplates a theory of compensation then the jury had facts before them from which they could reasonably infer the worth of the man as a citizen; *second,* if the proper construction of the statute involves the notion that the jury should regard circumstances of aggravation or mitigation, attending the death of Fletcher, then such circumstances were fully exploited in the evidence; and, *third* (and mainly), we base our decision on the ground that the instruction on the measure of damages given for plaintiff was couched in the general language of the amendment. If, now, defendant thought itself entitled to a modification of that instruction so as to include specific and definite directions to the jury, it should have asked instructions on that behalf. This it did not do, and it cannot complain of mere non-direction (see Morgan v. Mulhall, 214 Mo. 451, and cases cited). Since writing the above the constitutionality of the law has been before Division One of the court in Young v. Railroad, 227 Mo. 307. See that case *arguendo.*

The premises all considered, the judgment should be affirmed. It is so ordered. All concur, except *Woodson, J.,* who dissents in an opinion filed.

On rehearing In Banc the divisional opinion of *Lamm, J.,* was adopted by a majority of the court, *Fox, C. J., Gantt, Valliant* and *Graves, JJ.,* concurring; *Burgess, J.,* not sitting; *Woodson, J.,* dissenting in an opinion filed. The judgment is accordingly affirmed.

## DISSENTING OPINION.

WOODSON, J.—I understand the facts of this case to be somewhat different from those stated in the majority opinion, and for that reason I will recast the case as I see it disclosed by this record.

The suit was instituted in the circuit court of Adair county by the plaintiff, as administrator of the estate of Luke Fletcher, deceased, to recover the sum of $10,000 for the alleged negligent killing of said deceased; and for the sum of $56.95 alleged to have been due him for services rendered by him for the defendant. A trial was had before the court and jury, which resulted in a verdict and judgment for the plaintiff for the sum of $8000. From this judgment the defendant duly appealed.

The petition was in two counts. The first, formal parts omitted, reads as follows:

"Plaintiff states that on the 6th day of July, 1905, one Luke Fletcher died at Adair county, Missouri, that thereafter on the — day of July, 1905, S. A. D. Murphy was by the probate court of Adair county duly appointed administrator of the estate of said Luke Fletcher, and thereupon S. A. D. Murphy gave bond as such administrator and duly qualified as such, and that S. A. D. Murphy has ever since that time been and is now acting and brings this suit as such administrator of the estate of Luke Fletcher, deceased; that the defendant is, and at all the times herein mentioned was, a corporation, created, organized and doing business under the laws of the State of Missouri, and as such did on the 6th day of July, 1905, own, and was then, and for a long time prior thereto had been, operating a railroad, running northward from the city of St. Louis, Missouri, into and through Adair county, Missouri, on northward into and through the city of Kirksville, in Adair county, Missouri.

"That defendant's railroad running from south to north crosses at about right angles, among others the following named streets in said city of Kirksville and in the following order to-wit: Michigan, Wilson, Dodson, Water, Filmore, Scott, Pierce, and Jefferson, and that all of said streets and crossings are to the south of defendant's station in said city of Kirksville.

"That on the said 6th day of July, 1905, defendant's said railroad track, where it passes through the said city of Kirksville was, and had been daily for a period of several years immediately preceding that date, with the full knowledge of the defendant, and its officers and agents, servants and employees, used and treated as a thoroughfare by large numbers of persons, not employees of defendant, who were in the habit of walking to and fro thereupon, and on the tracks of defendant in said city, in the same manner and with the same freedom as if said railroad track had constituted a public highway of said city of Kirksville. That in view of said freedom and said habitual use of said railroad track by foot-travelers as aforesaid, with the knowledge of the defendant, it was the duty of the defendant, its officers, agents, servants and employees, who might run, conduct or manage the cars and trains of the defendant while the same were moving along its said railroad track in said city of Kirksville, to keep and maintain a sharp and watchful lookout for persons who might be on said track in front of said trains and cars moving thereon, and thereby exposed to danger, so that upon their discovery the trains and cars might be stopped in time to prevent their running against or over such persons and thereby injuring or killing them.

"That on the said 6th of July, 1905, while said Luke Fletcher was on said defendant's railroad track, at a point about fifteen feet north of defendant's switch-stand and just south of said Scott street crossing in said city of Kirksville, he was by the negligence and

unskillfulness of the officers, agents, servants and employees of the defendant in running, conducting and managing a locomotive engine and train of cars of the defendant, which was being moved by the defendant along said track, while in charge of its said officers, agents, servants and employees, run over and knocked down by said engine and train and thereby received injuries in consequence of which he died on the same day.

"Plaintiff further states that while said Luke Fletcher was upon the defendant's said railroad track, at the time and in the manner aforesaid and at the place aforesaid, the defendant's officers, agents, servants or employees in charge of said locomotive engine and train of cars, and who were then engaged in running, conducting and managing said engine and train of cars, saw, or by the exercise of ordinary care on their part, might have seen the said Luke Fletcher, and have become aware of the danger to which he was exposed while on said track as aforesaid, in ample time to have stopped said engine and train of cars before it reached him; but they negligently failed to keep a watchful lookout for persons who might then be on the track in front of said engine and train of cars, or negligently failed to stop said engine and train of cars after they knew, or ought to have known of the danger to which Luke Fletcher was exposed, when by the exercise of ordinary care they could and would have discovered the peril of said Luke Fletcher, in ample time to have stopped the train and avoided injuring and killing him.

"That on said 6th day of July, 1905, it was the duty of the defendant when running its engine and train of cars through said city of Kirksville at the place aforesaid, to run them at such a rate of speed as would permit the person in charge thereof to have them constantly under control, so that he could very quickly stop them to avoid injuries at said places, and to keep a watchful lookout for persons who might be upon de-

fendant's railroad track or approaching said public crossing; that defendant was guilty of a breach of its said duty in this—that on said 6th day of July, 1905, it ran and operated its locomotive engine and train of cars which injured and killed the said Luke Fletcher as aforesaid at the place where said Fletcher was killed as aforesaid, at a high rate of speed, to-wit, twenty-five miles an hour, when said rate of speed should have been greatly reduced, so that the person in charge of said engine and train of cars would have had them constantly under control.

"That the said act of the said defendant in operating its said locomotive engine and train of cars as aforesaid through that part of the said city of Kirksville as aforesaid was negligent and unskillful acts and conduct on the part of the defendant, said engine and train of cars ran against and over Luke Fletcher and injured and killed him as aforesaid.

"Plaintiff further states that the said Luke Fletcher was at the time of his death an unmarried man and about 50 years of age, and that he left surviving him no minor child or children.

"Wherefore plaintiff says a cause of action has accrued to the administrator of the estate of said Luke Fletcher, and the amount which said administrator is entitled to recover is the sum of ten thousand dollars. Wherefore plaintiff asks judgment for ten thousand dollars."

The second count was in conventional form for money due for services rendered.

The answer upon which the case was tried, formal parts omitted, is in words and figures following:

"Now comes the Wabash Railroad Company, defendant in the above entitled cause, and for its answer to the petition of plaintiff herein filed, denies each and every allegation in said petition contained and set forth.

"For other and further answer to the petition of plaintiff, defendant says that the death of Luke Fletcher, at the time and place stated in the petition, was solely the result of his own negligence, in then and there lying down upon the railroad track of defendant, and remaining there, without looking or listening for the approach of trains thereon, when by looking he could have seen, or by listening he could have heard of the approach of trains on said track in time to have remained away therefrom in a place of safety, and without exercising any care whatever for his own safety, while in the position hereinbefore described.

"For other and further answer to the petition of plaintiff, the defendant says that the death of Luke Fletcher here sued for, at or near Kirksville, Missouri, on or about July 6, 1905, was solely the result of his own negligence as above stated, in then and there lying down upon the railroad track of defendant, not at the crossing of any public highway, in open and express violation of section 1105 of the Revised Statutes of Missouri, then and there in full force and effect.

"Wherefore, defendant says that plaintiff is not entitled to have or maintain this action, and having fully answered, prays to be discharged with its costs."

There was no reply filed in said cause.

Plaintiff's evidence was substantially as follows:

The course of defendant's railroad track as it passes through the city of Kirksville is almost due north and south, and is perfectly straight. The depot is located on Washington street. Going south from the depot the track crosses at almost right angles the following streets: McPherson, Jefferson, Pierce, Scott, Filmore, Water, Dodson, Wilson, Michigan, Smith, Wall and George streets. The distance from Washington street to McPherson is two hundred and thirty-two feet, and from McPherson to Jefferson is two hundred and thirty-two feet, and from Jefferson to Pierce is two hundred and sixty feet, and from

Pierce to Scott is two hundred and sixty feet, and from Scott to Filmore is two hundred and sixty feet. A switch-stand is located about forty feet north of the north line of Filmore street, and about seven feet east of the east rail of the track. It was an ordinary switchstand, about six feet in height, with the usual signals. The deceased was struck and killed at a point about fifteen feet north of the switchstand, or fifty-five feet north of Filmore street. From the north line of Dodson street to the point where deceased was struck is eight hundred and twenty-five feet, and from the switchstand to Michigan street is twelve hundred and eighty feet. Filmore and Water streets are each forty feet in width, and all the others mentioned are sixty feet in width. George street is eight hundred and forty feet south of Michigan. The first street crossing open for travel, south of Scott, is about eleven hundred feet from Scott, and is about eight hundred and twenty-five feet south of the switchstand. Fillmore and Water streets are parallel to and are located between Scott and Dodson, but neither of them, as I gather from this record, are opened for travel across the railroad track.

The evidence discloses that, beginning at Scott street and extending south to Dodson street, some eleven hundred feet, the railroad track is located upon an embankment or dump. Including the slope it is about fifteen feet high, but the vertical height is not shown—high enough, however, presumably, to prevent travel on it across the track. From Dodson street north to the place of the accident it is down grade two and one-half inches to the one hundred feet, and between those points there was no obstruction of any kind to interfere with one's vision. The business portion of Kirksville was located northeast of the place of the accident. Pierce, Jefferson, McPherson and Washington streets are parallel streets in the order named north of Scott, and the distance from Washing-

ton to Scott is approximately one thousand feet. Wilson and Michigan streets are south of Dodson; Wall, Smith and George streets are south of Michigan—were laid out but were not traveled at the time of the injury as public streets.

The track of defendant, both north and south of the place of the accident, had been used for a number of years by the public generally residing in the southwest portion of the city as a highway in going to and returning from the business center of the city; that is, from fifty to one hundred people used the track for that purpose in the morning, at noon and night. There was a well-defined footpath leading from defendant's track southeast from the switchstand.

About ten minutes before the accident Fletcher was seen approaching the switchstand from the north. When he reached a point about fifteen feet north of the switchstand he sat down on the eastern end of one of the cross-ties, facing east. He then leaned over, placed his right elbow upon the east rail and rested his head in his right hand. His head and shoulders extended above the rail. There was nothing intervening between the place where Fletcher was sitting and fifteen hundred feet south to obstruct the engineer's view as he sat in the cab of the engine. The train at the time it struck deceased was running from fifteen to twenty miles an hour, and it stopped about one hundred yards north of the place of the injury. The whistle was sounded for the station when the train reached Dodson street, but not afterwards, nor was the bell rung.

A few minutes previous to the injury, while Fletcher was sitting or leaning against the track, a negro woman approached him waving a handkerchief, and told him to get off the track. She was on the right of way right close to the track. The deceased did not move. "The air-brakes were applied about where the man was sitting" on the track—that is, near the switchstand. The speed of the train was not slackened prior

to the time it struck Fletcher. One witness testified that immediately before deceased was struck he saw the engineer sitting in the cab on the right side of the engine, facing north toward where Fletcher was sitting and where the negro woman was waving the handkerchief. At the time Fletcher was killed he was intoxicated, and presumably this was why he sat down upon the track and refused to move when warned of his danger by the negro woman.

The train consisted of a light eight-wheel standard engine, equipped with air-brakes and emergency appliances, one baggage car and two coaches of the latest pattern.

The train running at fifteen miles an hour could have been stopped within one hundred and fifty to two hundred feet, and at twenty miles an hour it could have been stopped at from three hundred and seventy-five feet to four hundred feet.

Thereupon the court, at the request of counsel for plaintiff, gave to the jury instructions numbered from one to four inclusive, in the words and figures following:

"1. In behalf of the plaintiff the court instructs the jury that if you find and believe from the evidence that on the 6th day of July, 1905, the defendant operated a railroad, running through the corporate limits of the city of Kirksville, Adair county, Missouri, and that said railroad crosses from south to north at about right angles, among others the following named streets in said city of Kirksville, and in the following order, to-wit: Michigan, Wilson, Dodson, Water, Filmore, Scott, Pierce and Jefferson, and that on said 6th day of July, 1905, and continuously for several years prior thereto, defendant's said railroad track, from the place where it crosses said Jefferson street to a point two thousand feet south of said crossing, with the knowledge of the defendant, was used and treated as thoroughfare by a large number of persons, not em-

ployees of defendant, who were in the habit of walking to and fro thereon, in the same manner and with the same freedom as if said railroad track had constituted a highway of said city.

"And that upon the 6th day of July, 1905, Luke Fletcher was upon defendant's said railroad track, at a point between said Scott street and Filmore street, and was in a dangerous and perilous position, and in imminent peril of being struck by defendant's train, and defendant's employees in charge of said train became aware of his perilous position in time to have enabled them, by the exercise of ordinary care, to have stopped said train, and to have averted injury to said Luke Fletcher, or if the jury believe from the evidence that said employees in charge of said train, by the exercise of ordinary care, could have become aware of the perilous position of said Luke Fletcher on defendant's said railroad track, if the evidence shows said Luke Fletcher was in a perilous position, in time to have stopped said train, and to have averted striking said Luke Fletcher, and that they failed to exercise said care to stop said train, and that by reason of such failure to exercise such ordinary care, the said train was not stopped, and that said Luke Fletcher was struck and killed by said train on July 6, 1905, and that on said 6th day of July, 1905, said Luke Fletcher was an unmarried man, and left no minor child or children surviving him, and

"That on the 17th day of July, 1905, the probate court of Adair county, Missouri, appointed S. A. D. Murphy adminstrator of the estate of said Luke Fletcher, and that said S. A. D. Murphy duly qualified as said administrator, and has since been acting as such, then you will find for the plaintiff in a sum of not less than two thousand dollars nor more than ten thousand dollars. Although you may further believe that said Luke

Fletcher was guilty of negligence in going upon defendant's track.

"And by ordinary care, as used in this instruction, is meant such care as an ordinary careful or prudent person or persons would exercise under the same or similar circumstances.

"2. If the jury believe from the evidence that at the point on its track, where Luke Fletcher was struck and killed by defendant's train, if you find he was struck and killed on defendant's track by one of defendant's trains, said track was clear and unobstructed and sufficiently straight to permit a plain view along the track from an approaching train,

"And if the jury believe further that at said point where said deceased was struck by the train, the road bed of defendant, both north and south of said spot, was at that time used, and had for a long period of time prior thereto been used, with the knowledge of defendant, its servants and employees by pedestrians as a passway leading to and from the business center of said city of Kirksville, then it was the duty of the employees of the defendant in charge of the train, when approaching such portion of the roadbed of defendant as was used as aforesaid as a passway, to keep a lookout for persons, and to ascertain that the track was clear.

"3. The court instructs the jury that nine or more of your whole number may return a verdict and in the event that nine or more and less than your whole number find a verdict, then the same must be signed by each juror so concurring, but if your whole number agree, your verdict may be signed by your foreman alone.

"4. The court instructs the jury that if you find for the plaintiff your verdict may be in the following form:

"We, the jury, find for the plaintiff in the sum of ..................... dollars.

........................Foreman."

To which action and ruling of the court, in giving the aforesaid instructions, numbered one to four inclusive, the defendant, by its counsel, then and there at the time excepted.

Thereupon the court, at the request of counsel for defendant, gave to the jury the following instructions:

"1. The court instructs the jury, that if they shall believe from the evidence that the deceased, Luke Fletcher, was sitting or lying on or near defendant's track, at the time he received the injuries of which he died, then in such case the deceased, Luke Fletcher, was a trespasser and was guilty of negligence.

"2. The court instructs the jury, that if they believe from the evidence that the deceased, at the time he received his injuries was sitting on the ends of the ties of defendant's track, he was in so doing guilty of negligence, and the fact that he was intoxicated, if such was the fact, did not relieve him from the duty of exercising ordinary care for his own safety.

"3. The jury are instructed that in considering what their verdict should be they must not in the slightest degree be influenced by any feeling of sympathy, or the relative condition of the parties to the suit, but must lay aside all such feelings and be governed solely by the evidence as they have heard it in the trial, and the law as contained in the instructions.

"4. The court instructs the jury, that if they believe from the evidence that the deceased was sitting on the ends of the ties, at and shortly before he was struck by the engine, then plaintiff cannot recover on the ground that the bell was not rung or the whistle sounded even if the jury believe that the bell was not rung and that the whistle was not sounded.

"4a. Gentlemen of the jury, if your verdict be for the defendant, it may be in the following form:

"We, the jury, find for the defendant.

...................... Foreman."

Thereupon counsel for defendant requested the court to give to the jury the following further instructions, numbered 5, 6 and 7, which the court refused:

"5.  The court instructs the jury, that although they may believe from the evidence in the cause that pedestrians were in the habit of walking along defendant's railroad track, at the place of the accident, and that the railroad officials knew of such use of the track and consented to it, at and prior to the time Luke Fletcher was struck and killed; yet if the jury shall further believe from the evidence that the said deceased was neither walking nor standing upon the track, at and just before he was struck and killed, but was sitting or lying upon the track, then he was a trespasser and the defendant's engineer was not bound to be on the lookout for him.

"6.  The court instructs the jury, that if they believe from the evidence that the injuries and death of deceased, Luke Fletcher, were caused by his own negligence, they will find for the defendant.

"7.  The court instructs the jury that although you may believe from the evidence that the defendant's railroad track, at the place where the deceased, Luke Fletcher, was struck, had been used by the public as a footway to such an extent that the engineer in charge of the train ought to have kept a sharp lookout to discover persons walking thereon, yet he was under no obligations, and was not required to keep a lookout to discover persons lying on the track, and if you believe from the evidence that the deceased, Luke Fletcher, was so lying on the track, then he was a trespasser under the law, and the defendant is not liable in this case, and your verdict should be for the defendant."

To the action and ruling of the court in refusing to give each and all of said instructions, numbered 5,

6 and 7, the defendant by its counsel then and there at the time excepted.

I. Respondent relies upon the so-called · humanitarian doctrine for an affirmance of this judgment; while counsel for appellant first assail the soundness of that doctrine; and, second, insist that this case does not fall within that rule.

I will first consider the insistence that the humanitarian doctrine relied upon for an affirmance of this judgment is unsound, unwise and against public policy as declared by the common law and the statutes of the State.

I have no hesitancy whatever in saying that I believe this so-called humanitarian doctrine is not only unsound, but is unhuman in the extreme, and should be abolished. In its consideration, however, I do not wish to be misunderstood, and for that reason will fully state my position.

(a). · If we consider this doctrine from a narrow view, that is, one of remedy, simply affording redress, as far as may be, to each individual person injured, then there is a spirit of humanity underlying one branch of it; but when we take a broader view of the rule, as we should, that is, all laws should have for their primary object the protection of the citizen, and a prevention of all injury to the members of society, then the so-called humanitarian doctrine is clearly a misnomer in that it induces people to expose themselves to great dangers by inviting them to enter upon and walk along railroad tracks, where they have no legal or moral right to be, where they are liable to be brought in contact with powerful and dangerous machinery, where of necessity engines and cars must be maintained and operated, and which can be maintained and operated nowhere else. It is not wrong to compensate, as far as possible, the individual person injured where he is willfully injured by those in charge of railroad trains, and I do most vigorously assail the doctrine itself, which, if

abolished, would leave no individual case of injury for which compensation should be made. As before stated, this doctrine invites citizens to places of danger which frequently results in the loss of life or limb and with the interference of commerce of the country, as well as useless waste of treasure. By the enforcement of that doctrine the average citizen is led to believe that the railroad tracks of the country are public highways upon which pedestrians have the legal right to travel; and every case decided upholding and enforcing that doctrine proclaims to the people of the community in which the trial takes place that they have the joint legal right with the railroad companies to the occupancy and use of the tracks as public highways, and that the companies must use reasonable care and caution for their safety, and are liable in damages for all injury inflicted in all cases where the servants in charge of the train saw or by the exercise of ordinary care could have seen the trespasser upon the track in time to have warned him of the danger; or otherwise have prevented the injury, but failed to do so regardless of his own contributory negligence. This is not only a false doctrine based upon bad morals, which I will try to demonstrate, but it is also violative of an express statute of the State, which, if enforced, would discourage trespassers from going upon and using the railroad tracks as public thoroughfares, and thereby avoid all exposure to danger and the consequential destruction of life and property.

The statute referred to is section 1105, Revised Statutes 1899, and the portion thereof applicable to this class of cases reads: ''If any person not connected with or employed upon the railroad shall walk upon the track or tracks thereof, except where the same shall be laid across or along a publicly traveled road or street, or at any crossing, as hereinbefore provided, and shall receive harm on account thereof, such person shall be deemed to have committed a trespass in so

walking upon said track in any action brought by him on account of such harm against the corporation owning such railroad, but not otherwise."

Under the plain letter of this statute, Fletcher was a trespasser, and if enforced it would prevent a recovery in this case. The plain meaning of that clause of the statute is, that where a person is injured while walking, standing or sitting upon a railroad track he is to be considered guilty of negligence *per se*, which will defeat a recovery of damages for personal injuries in all cases where contributory negligence would defeat it. [Beach on Contributory Negligence (3 Ed.), secs. 202-212; Morgan v. Railroad, 159 Mo. l. c. 270.]

The plain mandate of this wise statute prohibiting all persons from walking along or upon any railroad track, except where it is laid along, upon or across a public road, street or other highway, has been totally ignored or evaded by the courts by extending the right of the people to walk upon all parts of the track, whether laid in a public street or not. It is for this reason I say the courts have, contrary to the statute, legalized the right of the people to walk upon all portions of the track where pedestrians have been in the habit of walking, regardless of the fact that it is not situated in a public road or street. This is true for the reason that there is not a foot of railroad in this State or country but what is being constantly used by tens and hundreds of thousands of pedestrians in traveling from one portion of the country to another. This is well known to all well-informed persons.

One of the leading cases so extending this right of pedestrians is the case of Morgan v. Wabash Ry. Co., 159 Mo. 262. On page 279 thereof this language is used: "It is argued that since the statute denounces as a trespasser one walking on the track of a railroad that is fenced, no custom or usage can alter that condition; and Lawson on Usages and Customs, sec. 216, is cited. Of course, usage and custom cannot repeal

a statute, and it is not contended here that it does. But usage and custom may change the conditions of a thing upon which the statute operates; and by usage and custom a publicly-traveled footpath may be in fact created within an otherwise private inclosure, so that a person found walking upon it would not be amenable as a trespasser. The language of the statute itself excepts a track laid along a 'publicly-traveled road.' To fill this description it need not be a public road, but must be publicly-traveled. If the railroad company, as the evidence tended to prove in this case, for more than twenty-five years had acquiesced in its track being used as a footpath by the whole community, it cannot, if it does wrong,take refuge in the fact that its track was inclosed private property.''

Upon what is this extension based and what is the effect thereof? It is not pretended that the statute in question either by express terms or by implication authorizes pedestrians to walk upon or over the tracks of any railroad company except where they are laid upon and along a public road or street, but this court has violated the statute and authorized or has legalized trespassing upon all portions of railroad tracks where it is shown the public has been in the habit previously of traveling upon and over them. While the court does not hold that said usage repeals the statute, yet it does hold that its continued usage without objection on the part of the company amounts to an implied license to walk upon its tracks or a waiver of the trespass declared by the statute.

And according to the doctrine laid down in the Morgan case, supra, there is not a mile of railroad in this State, or in the United States, for that matter, but what has by usage become also a public highway for pedestrians; that is, a public highway for pedestrains has, by usage, been carved out of another public highway, when it must be conceded a railroad company cannot by express grant create such a highway

over its tracks, nor could the public acquire such by prescription or adverse possession. Both of these propositions are so well-settled in this country a citation of authorities in support thereof would be utterly useless.

All of the cases announcing the doctrine stated in the Morgan case are bottomed upon the alleged acquiescence of the railroad company to the public usage of the tracks as a public highway. Where do the courts find evidence of such acquiescence? Is it to be inferred simply because people walk upon them, or because the company does not maintain an armed guard to keep the public from its tracks by force? Certainly not, for the reason that it would require a standing army of a quarter of a million of men for that purpose, if only one was provided for each mile of track existing in this country to-day; and even then they could not prevent such usage, for the reason that none of them would have the right to arrest the trespasser, not being officers of the law; and while they would be at one end of their beat, the pedestrian would be walking upon the track at the other end and *vice versa*. Not only that, but if any such guard should attempt to exclude all persons by force from walking upon the tracks, they would be met with physical and armed resistance, which would lead to numerous breaches of the peace and would cause conflict between the guards and the misinformed people, who believe they have the legal right to walk upon and across the tracks at pleasure. I know of but one instance where the employees of a railroad company attempted in obedience to instructions to exclude all persons from the tracks; and while that attempt was successful, yet it resulted in a personal encounter between the employees and the pedestrian and in the death of the latter, for which killing this court held the company liable in damages, and for which it had to pay $5000, together with interest and costs of suit. See case of

Haehl v. Railroad, 119 Mo. 325. J. W. Hill, the watchman who killed Haehl, was indicted and tried for murder, and acquitted of the charge by a jury in the circuit court of Warren county on the grounds of self-defense. Here we have an employee performing his duty to his principal, in excluding a trespasser and wrongdoer from the company's property, and while doing so he was unlawfully attacked by the wrongdoer, and in self-defense it became necessary for him to slay the trespasser, yet the principal was held liable in damages for the act of the watchman, notwithstanding the latter was rightfully discharging his duties to his employer. What a travesty upon justice! This injustice naturally arises out of this erroneous doctrine.

Since the rendition of that judgment no railroad company in this country has possessed the temerity to attempt to exclude pedestrians from its tracks by force. If this mode of exclusion was otherwise feasible, still it would be wholly impracticable, for the reason that the companies would have to pay to the guards about $25,000,000 a month for salaries alone, allowing for each guard only one dollar a day for his services, or $300,000,000 annually, which would bankrupt the roads, or increase the cost of transportation beyond all bounds of reason. So under this view of the situation, it cannot be truthfully said the railroad companies of the State and country are acquiescing in the public's use of their tracks because they do not by force exclude all persons from them.

Nor can acquiescence on the part of the roads be inferred by the courts from the mere fact that the companies do not warn the public against the use of their tracks as footpaths. What would be the form of the warning or objection to be served upon the public, and upon whom should the service be made? The only known mode or manner of serving notices against trespassing upon railroad property that I know of is by printed or painted notices posted upon and along

the roadway, warning persons to keep off of the tracks. These notices are to be seen posted from one end of the road to the other, posted in divers places, but they are not sufficient, it seems, to keep pedestrians off of or to revoke this mysterious acquiescence so glibly spoken of by the courts in this class of cases. [Everett v. Railroad, 214 Mo. 54.] In the case cited it was said, "There was no sign warning the people against trespassing upon the railroad property, except the one painted upon the exterior of the wall of the passenger station at Pacific, which was about twenty-five hundred feet west of the place where the accident occurred." According to that case it is seen the notice there mentioned, which was posted only twenty-five hundred feet away, was ineffectual to warn the public to keep off of the tracks or to revoke the company's alleged acquiescence in the public's use of the tracks, or rather to prevent persons from acquiring the right to use the track as a public highway; nor is there any expression contained in that opinion indicating that the result would have been different had the notice been posted only a thousand feet or a less distance from the place of the accident. In fact, the notice in that case had but little or no effect, which is almost invariably the case.

No other means have been suggested besides these two by which the companies could manifest their non-acquiescence in pedestrians traveling over their roads, and neither of them is sufficient for that purpose.

I have dwelt somewhat upon this subject for the purpose of showing how absolutely hollow and meaningless are the oft repeated expressions of the courts to be found in this class of cases to the effect "that at the time of the injury plaintiff was walking along a well-defined footpath, leading along or across defendant's tracks, which the public had used for years with the knowledge and acquiescence of the defendant, and for that reason the servants and agents in charge of

the train were, under the law, legally bound to be on the lookout for the presence of persons at said point; and had the servants in charge of the train discharged that duty by keeping a constant watch for persons who might be walking along said path, they could have seen him in time to have prevented the injury; and having failed to do so, the company is liable for his injury." It is upon this absolutely false statement of *acquiescence* that the courts evade the plain letter of the statute and permit the public at large to trespass upon private property at will to the great detriment of its owners.

Under this view of the statute the railroad companies of the State and nation are not only rendered absolutely powerless to keep trespassers off of their property, but because of that helpless condition they are held to acquiesce in those trespasses and are liable to the trespasser for all injury done him while so trespassing upon their property. The effect of this holding is to convert a law-abiding railroad company, which is properly and legally running its trains upon and over its own tracks where it has the exclusive right to be, into a lawless wrongdoer, and at the same time legalize the unlawful presence of the trespasser upon the tracks of the company and mulct it in damages for incidentally injuring the wrongdoer, which could not have happened had it not been for his own unlawful act. The innocent and law-abiding citizen is made to suffer constantly for the wrongful and illegal acts of the wrongdoer.

I am not speaking of the individual case where some poor unfortunate who might through negligence stray upon the tracks of some railroad company and become exposed to danger, and who was seen and could be saved from injury by the exercise of reasonable care on the part of those in charge of the train, but willfully failed to do so; but I am referring to the rule which permits and authorizes any and all persons

to trespass, at will, upon railroad property, and thereby voluntarily and uselessly expose themselves to danger, and, when injured under those circumstances, hold the company liable for the damages they sustain in consequence of that exposure, and that, too, when the company is absolutely powerless to run elsewhere or to exclude the wrongdoer from its tracks.

Let us view this subject in a more concrete form. The last railroad statistics I have been able to find were issued by the Interstate Commerce Commission for the year 1906, and on page 15 thereof I find that there were on June 30th of that year 8064 miles of railroad in this State; and on page 16 it is shown that on the same day there were 222,571 miles of railroad in this country, which cost approximately, as shown on page 105 thereof, $52,064 per mile, or in the aggregate $11,588,922,421. This does not include equipment, etc., but is confined to cost of roads alone. Notwithstanding the private ownership of this vast property, this large outlay of money and the devotion of these hundreds of thousands of miles of railroads to State and interstate commerce, still under the construction placed upon said section 1105 the owners thereof are absolutely powerless to prevent the public from maintaining over their roads other public highways for the use of pedestrians, and that too without just compensation paid therefor—all to the great detriment and serious interference with the commerce of the country.

I wish to call special attention to some of the well-known evil results of this unlawful and vicious habit of people walking upon railroad tracks. I wish to give some of the statistics showing the number of trespassers killed and injured by the Wabash Railroad Company alone during the year 1908, as follows:

Murphy v. Railroad.

| State. | Number of Trespassers | Percentage of Trespassers | Mileage of Road | Percentage of Mileage of Road |
|---|---|---|---|---|
| Canada | 3 | 3% | 244 | 10% |
| Michigan | 6 | 7% | 105 | 4% |
| Ohio | 4 | 5% | 170 | 7% |
| Indiana | 9 | 11% | 357 | 14½% |
| Illinois | 16 | 20% | 743 | 30% |
| Missouri | 39 | 48% | 653 | 26% |
| Iowa | 5 | 6% | 208 | 8½% |
| Total | 82 | 100% | 2480 | 100% |

| State. | Total Train Miles. | Percentage of Train Miles. |
|---|---|---|
| Canada | 1,555,645 | 10% |
| Michigan | 867,881 | 6% |
| Ohio | 898,538 | 6% |
| Indiana | 2,487,460 | 16% |
| Illinois | 5,093,910 | 32% |
| Missouri | 3,920,799 | 25% |
| Iowa | 803,623 | 5% |
| Total | 15,627,856 | 100% |

(By ''trespassers'' is meant all persons who were injured or killed while walking on the tracks of the company.)

The foregoing statement needs some explanation. For instance, three persons mentioned were injured or killed in the Dominion of Canada, which has a statute

making it an offense for persons walking on railroad tracks. Those three constituted approximately three per cent of the whole number killed or injured on the lines of this railway system. The mileage in Canada is two hundred and forty-four miles, which is approximately ten per cent of the road mileage of the entire Wabash system. The total miles trains ran in Canada was 1,555,655, being approximately ten per cent of the total train mileage of the system.

It will be observed that while the road mileage and train mileage in Canada are each ten per cent of the entire road system and the entire train mileage, the number of trespassers injured or killed in that country was only three per cent of the total number; while in this State the road mileage is twenty-six per cent of the total road mileage and the train mileage twenty-five per cent of the total train mileage, forty-eight per cent of the total number of trespassers injured or killed were injured or killed in Missouri.

Illinois has thirty per cent of the road mileage and thirty-two per cent of the train mileage, and only twenty per cent of the total number of trespassers injured or killed were injured or killed in that State.

It is important to know both the train mileage and the road mileage, for the reason the greater number of trains that are run over a given road mileage the greater number of fatalities to trespassers will result. The train mileage, therefore, in the various States offers the most accurate basis for comparison.

A computation will show that one trespasser was killed for every eighty-one miles of road in Canada; for every seventeen miles in Michigan; for every forty-two miles in Ohio; for every thirty-one miles in Indiana; for every forty-six miles in Illinois; for every seventeen miles in Missouri; and for every forty-one miles in Iowa.

It will be observed that the number of miles for each trespasser killed in Missouri and Michigan is

the same. This results, however, from the fact that
the line from Chicago, St. Louis and other points con-
verging at Montpelier, Ohio, and thence all the traffic
eastward goes over the one hundred and five miles of
line located in the State of Michigan. The effect of
this is also shown in the train mileage. Thus, while
Michigan has only four per cent of road mileage, it
has one-third or six per cent of the train mileage.
The population along the Michigan mileage is very
dense; about five miles of the line from Delray to
Detroit run through a very densely populated district—
practically a city.

It should also be noted that while Illinois has
greater road and train mileage than Missouri, only
sixteen trespassers were injured or killed while walk-
ing on tracks in that State, whereas thirty-nine persons
were killed or injured while walking on the track in
Missouri. If we also consider the more dense popula-
tion of Illinois, the figures become more startling.
And if we should extend these figures in the same pro-
portion to all of the railroads of the State and country,
we would then see the appalling number of trespassers
killed and injured annually on account of this inhuman
doctrine, which is approximately 7750.

In so far as I have been able to ascertain, the
courts of all the other States than this hold that per-
sons who walk upon railroad tracks do so at their peril,
and I am thoroughly satisfied and convinced that this
fact accounts for the small number of fatalities to
track-walkers in those States as compared with Mis-
souri; and by parity of reasoning I am also convinced
that if said section 1105 was strictly enforced, as it
should be, the contrast between those States and this
would not be near so great as it is now; and that if we
had a statute like that of Canada, making it a crime
for persons to walk upon railroad tracks, then the per-
centage of fatalities to track-walkers in this State
would fall still lower than what it is in any of the States.

mentioned.   Such a policy and such a statute would exclude from the railroads all pedestrians, and thereby· save this great sacrifice of life and limb, as well as the pecuniary loss incident thereto.

Not only this, the health, safety and welfare of the entire State and nation depend upon the commerce of the country, and especially is this true of our large cities.  Without these great arteries of commerce carrying to them the necessities of life, they could not exist a fortnight, and sickness, pestilence and starvation would reign supreme in their midst.   The railroads also afford transportation for all the surplus products of the farm and mines, and distribute the fruits of labor to the home of every consumer.   Notwithstanding the great importance of commerce to the entire country and to every member of society, yet it is a well-known fact that this species of trespass upon railroads is one of the greatest perils to and interference with the commercial interests of the country.  After months of research and investigation I find that at a low estimate each passenger and freight train as it passes over this system either meets or overtakes on an average one trespasser for every twenty miles traveled by every train that passes over its tracks.   And if we divide the number of train miles traveled by all the trains over the Wabash system during the year 1906, *viz*: 15,627,856, by twenty, it will give us 781,397, the number of trespassers who were met or overtaken by trains on the Wabash system alone during that year, and that does not include the untold numbers who left the tracks before the trains reached them, and who consequently were not met or overtaken by any train, but who were liable to be.   At the same ratio, if the trains upon all other railroads traveled the same number of miles· proportionately as did the trains upon the Wabash, then the aggregate number of train miles traveled by all the trains upon all the roads was 1,375,462,613 miles, and the number of trespassers met

and overtaken by those trains was the appalling number of 6,877,313.

Of course there is no way of ascertaining how many of the same trespassers were met or overtaken by different trains, perhaps two or perhaps a dozen, and maybe more, but in reality that makes no material difference, for the reason that every time a train meets or overtakes a person upon the track, it is liable to strike him, and it is wholly immaterial whether it is the same person met ten different times or ten persons met only once each—the chance for injury is just the same in each instance.

I have also ascertained that each freight and passenger train on the entire Wabash system, which is 2517 miles in length, is required to stop at least once every thirty days in order to avoid injury to some trespasser upon its tracks; and that each of said trains is also required to slacken its speed at least twice every week for the same purpose. During the year 1906 there were 75,416 regular passenger and 94,468 regular freight trains operated over the Wabash system, as appears from its various time-tables, which is on an average of 465 trains a day, and if each of these trains was required to stop once every month, or twelve times a year on account of trespassers being upon the tracks, then we would have twelve times that number or 5580 stops made on that account by the trains on that road alone; and if each was required to slacken its speed twice a week or 104 times a year for the same reason, then the number of times they so slackened their speed during the year was 104 times 465, or 48,360. I am also informed from actual tests made extending over a period of years that it requires in emergency stops seven minutes on an average to stop and start a train, and to regain its full speed when running at the usual and ordinary rate of speed, and two and one-half minutes to slacken and recover full

speed again. If we multiply the nmber of stops, 5580, made each year by the Wabash trains on account of trespassers by seven, the number of minutes required to stop and start a train, we would have 39,060 minutes lost in stopping and starting trains, and if we multiply the number of times, 48,360, the trains on that road are required to slacken their speed yearly, for the same cause, by two and one-half, the number of minutes required to slacken and gain speed, we would have 120,900 minutes, total 159,960 minutes, or in round numbers one hundred and eleven days, being the time lost by one train each year upon that system on account of trespassers. And to apply this same ratio of stopping and slackening the speed of trains to all the other railroads of the country, which aggregate 222,571 miles, assuming for a basis that they have the same number of trains per thousand miles the Wabash has, then we have the grand total of 8991 days lost in the trains' service by all of the railroads of the country, or a loss which equals the service of twenty-five trains annually. In other words, trespassers upon the railroads of the country decrease the annual carrying capacity of the roads of the country to the extent of the carrying capacity of twenty-five trains; and the general average freight train consists of thirty-one cars and that of a passenger of five coaches.

If all of the carrying capacity lost on this account was confined to freight trains only, then the decreased freight carrying capacity of the railroads of the country would be reduced to the extent of 775 cars daily or 282,875 cars for the entire year; and if the decrease was confined to the passenger trains, then the passenger carrying capacity of the roads would be reduced to the extent of 125 cars a day or 36,625 for the entire year.

Not only is this loss in the carrying capacity of the roads a great loss to the commercial interests of the country, but it is also a net loss of many millions

of dollars to the various roads in the loss of freight and passenger charges. If we add to this the hundreds of thousands of dollars paid out annually by the various roads for breakage and derailments caused to trains by these emergency stops, we would then realize the enormous financial loss sustained by the companies in their individual capacity; and to this should be added the large sums of money paid out annually by the various roads in the nature of damages for personal injuries inflicted upon this class of trespassers.

Since writing the above, in looking over the St. Louis *Republic,* my eye fell upon the following:

## "LOSS AND DAMAGES $56,700,000.

### "RAILROADS MAKE HEAVY PAYMENTS FOR INJURIES TO PERSONS.

"Chicago, September 10, 1909. Railroads of the United States paid approximately $56,700,000 for 'loss and damage' and 'injuries to persons' during the year ending June 30, 1908, according to a report made public to-day by the Bureau of Railway News and Statistics. This is an increase of $8,441,000 compared with the preceding year.

"Statistics are given showing that payments on account of 'injuries to persons' increased 254 per cent between 1897 and 1907, and for 'loss and damage' 437 per cent, while during the same period, gross earnings of the railroads increased only 130 per cent.'"

No one who has kept posted upon this class of litigation would say that the above statement is an exaggeration of the losses paid by the railroads of the country on account of personal injuries; and they all know that a very large percentage of that sum is paid by the companies for injuries inflicted upon trespassers while being wrongfully upon their roads.

Besides, at a low estimate, it costs a railroad company at least $2.50 in cash for each and every train stop at a point other than its regular stations, or the sum of thirty dollars for the twelve stops it is required to make annually on account of these trespassers; and if we multiply that sum by 456, the number of trains of the road in use, we have the sum of $13,950 money actually paid out on this account.

And at the same ratio all of the roads would pay out for this purpose annually the sum of $1,129,950, and this does not include the great loss for slackening the speed of trains, which I dare say equals that sum. And this is not all the damage sustained by the railroads by these emergency stops. They often cause the train to buckle, that is, the cars in the front and those in the rear of the train to so crowd and jam against those in the center as to cause them to cramp and break in two, or to break the drawbars or other portions thereof, and not infrequently it causes them to jump the track, which causes still greater damage, delay and blocking the road. This occurs more frequently in freight trains. In long freight trains more than fifty per cent of such stops cause some such damage as above mentioned, and will more or less damage the engine drawing the train, and often inflict personal injury upon some one or more of the employees in charge thereof. In passenger trains the tendency of such stops is to throw the passengers from their seats, which often results in personal injury to them, which is vouched for by the numerous cases found reported in the reports of the courts of the various States. This also causes much delay and cost to the companies.

In addition to the foregoing there are many material inconveniences and substantial damages done to the public at large on account of these interferences and delays which cannot be computed in dollars and cents. They cause trains to be late and miss connections with trains upon other roads, thereby caus-

ing delay and misconnections on the part of the traveling public generally, which greatly interfere with business and pleasure, as well as delay, and interfere with the mail service of the country, in which all are deeply interested.

(b). There is another fallacious argument advanced by the courts for enforcing this so-called humanitarian doctrine, and that is the absolute ease with which such trespassers may be discovered upon the tracks and the facility with which they could be warned of their danger, or their injury averted by simply the ringing of the bell, sounding of the whistle or pulling of a lever to shut off the steam and thereby stop the train.

Let us examine this argument for a moment. The positions of the engineer and fireman are not sinecure by any means. The responsibility resting upon the former is not excelled by that of any person who serves the public in the transportation department. Upon his shoulders rest the safety of the trains which carry not only commodities but human freight also. The lives of our fathers, and mothers, wives and children and other relations and friends, so near and so dear to all of us, are intrusted to their care and safe-keeping. His first and primary duty is to look after their personal safety; and that is done by keeping a vigilant and constant watch over his engine and train, and when he sees or hears anything foreboding danger to his train and passengers he must act promptly for their safety and welfare. It is not only incumbent upon him to detect impending danger but he must also exercise the highest degree of care to shield them from all danger. He must see that his engine is in good running order and that it does not get out of repair while in transit. He must also see that the proper quantity of water is maintained in the boilers. If too much water is injected, it reduces the volume of steam and the

speed of the train; and if too little, an explosion is likely to occur, which is exceedingly dangerous to himself, the employees with him, as well as to the train and the passengers thereon, as well as the commodities intrusted to his care.

The engineer must also keep his engine properly lubricated while running. This is done by a lubricator placed in the cab beside him. The cylinders and other sensitive portions of the engine must be constantly watched and lubricated, which requires a great deal of attention on the part of the engineer.

One of the greatest cares and strains resting upon the engineer regards his schedule. That requires his constant attention; and it is his imperative duty to run his train as nearly according to the schedule furnished him as it is possible for him to do so. He must run his train on time, neither ahead of nor behind time— either is liable to result in disastrous collision between trains and injury and death to the passengers thereon. If late, then misconnections for the passengers, express and mail matters must follow also, which greatly discommode and inconvenience all, and often result in great financial loss to the company and to the public generally.

I repeat, the safety of the traveling public depends more largely upon the engineer than upon any other person connected with the railway service. If he is observant, careful and obedient to orders he will safely land his train and passengers at points of destination; but if his time is devoted to looking out for trespassers upon the track, or if he is indifferent, negligent or disobedient, disaster certainly awaits his progress, collision and wreckage must follow, and death and destruction must overtake those intrusted to his charge.

The engineer should always have his presence of mind in order to better enable him to meet every emergency as it may arise; and there is nothing which tends to so excite and confuse him as to kill or injure

his fellowman. This is a constant dread and hangs like a millstone around the neck of almost every engineer. He is no exception to the rule. Being conscious that he has taken human life or has greatly imperiled the life of a fellowman greatly disconcerts him and incapacitates him from discharging the all-important duties resting upon his shoulders. His mind tarries with the sad and grewsome picture left behind, and is not concentrated and fastened upon his duties with "hooks of steel" as it should be. His knowledge that he is liable at any moment to come in contact with some one of the hundreds of trespassers who line the tracks in front of him is alone sufficient to perturb his mind and divert his attention from his duties. The roadbed, tracks, engine and cars are liable to become out of order at any moment, and prompt action in any such case on the part of the engineer is the only thing that separates the train and its passengers from destruction and death. Prompt action might be and doubtless is frequently prevented by the engineer's attention being diverted from his duties, by the conduct and presence of pedestrians upon the tracks who suddenly appear in front of a rapidly approaching train as it rounds a curve or ascends a grade, running perhaps fifty miles an hour. Under those circumstances, knowing that inevitable death awaits the trespasser, and in his confusion (which is human) in trying to save his life he may do the wrong thing or fail to do the right thing at the proper time, and the result is the train, weighing thousands of tons, composed of wood, steel and iron may be piled up in a wreck by the side of the road with the passengers and employees buried beneath.

The direct tendency of trespassers being upon the track is to produce just such results as before suggested. They not only imperil their own lives by being there, but they also thereby jeopardize the safety of the traveling public in general.

What has been here said also applies to freight trains, the only difference being in the character of freight carried. In both cases the engineer has something more to do than simply to sit upon his seat in the cab and look out for the safety of some trespasser who has no legal or moral right to be upon the tracks. Yet under this doctrine he must keep a constant watch for him, for it not only holds the company liable where the employees see the trespasser but also where they could have seen him by the exercise of ordinary care.

The fireman upon a railroad engine, too, has something to do besides looking out for tramps and trespassers. Upon a passenger engine he is required to carry in a shovel from the tender to the engine three tons of coal every hour and place it in the fire box of the engine. That is, he must carry one hundred pounds of coal every minute and place it in the engine; besides that he must keep the grate shaken down and free from ashes, keep the fire at the proper degree of heat to generate a proper quantity of steam, and ring the bell for road-crossings, etc.

The duties of a fireman in a freight train are more arduous than are those on a passenger train, for the reason more fuel is consumed, and consequently he must handle more coal.

(c). Nor can the engineer and fireman always readily distinguish between objects standing or lying upon or near the track. A man lying upon or near the track might very naturally be taken for a dog or other animal which would readily seek a place of safety upon the approach of the train. This mistake might not be discovered until it was too late to avoid a collision. The track is not always straight or level. The engineer and fireman cannot see around a curve nor through or over a hill; and the light is not always the best. All of these things frequently make it very difficult to determine the character of such objects, all of which take much time and close observation and

necessarily divert their attention from their more important duties. When the identity of the object cannot be properly discovered and when that is true, if the train is to be stopped until that fact is ascertained, then the trains will always be late and misconnections will be inevitable; and if, upon the other hand, the stop is not made until the identity is determined, then the train may approach too near the person to permit those in charge thereof to avert the injury. We have at least three decisions of this court involving that question, one of which is Trigg v. Water, Light and Transit Co., 215 Mo. 521. This case refers to and discusses the other two. In all such cases under this doctrine, the closest attention must be paid to such objects in order to determine their character.

In either case a less degree of care must necessarily be paid to the train and passengers by those in charge of same, for the reason they cannot keep up a constant lookout for trespassers and at the same time pay constant attention to the train and the safety of the passengers. If they neglect the trespasser for the care of the train and passengers, then the company might be subject to the payment of damages for negligently injuring the trespasser; and should they neglect the passengers while trying to protect the trespasser and they should be injured in consequence thereof, then clearly the company would be liable for all such injuries, as its first and primary duty was due to them. In both instances the company is held liable, and both are rendered possible by the unlawful presence of the trespasser upon the track; and his presence necessarily diverts the attention of those in charge of the train from its care and concentrates their minds upon the wrongdoer. Whereas, if the latter should be excluded from the track he would not be injured nor would he need care or attention at the hands of those in charge of the train, who are ever burdened with as many or more duties than they can properly

perform. Of late and since the installation of the largest engines I have several times noticed articles published in the press suggesting the necessity of a third man being placed in the cab of the engine to assist the engineer and fireman whenever assistance is necessary. I mention this fact simply for the purpose of showing that the engineer and fireman have more important duties to perform than simply to keep a lookout for trespassers who may be upon the track.

(d). This suggests another anomaly that exists in our law which is the product of this unwise doctrine, and that is, under the common law, as many times decided by this court, those in charge of a train are not required to look out for the safety of section hands and others who are rightfully upon the track—they must look out for their own safety; but under this doctrine the engineer and fireman must keep a sharp lookout for the trespasser, and if he should be injured through their negligence, then this doctrine will excuse his negligence and wrong-doing and hold the company liable therefor, but not so in case a section hand is injured. [Evans v. Railroad, 178 Mo. l. c. 517; Helm v. Railroad, 185 Mo. l. c. 224; Clancy v. Transit Co., 192 Mo. l. c. 656; McGrath v. Transit Co., 197 Mo. l. c. 108; Lynch v. Railroad, 208 Mo. l. c. 30; Sissel v. Railroad, 214 Mo. l. c. 528.]

It is a well-known fact that so great and intense are the responsibilities resting upon the engineer and fireman in running their trains that they seldom speak to each other except in connection with the strict performance of their duties. They sit at their perilous posts of duty with their lives and those of the passengers resting in the hollow of their hands, with their minds intently riveted upon the things they are doing, deliberately studying and trying to anticipate the things that are to be done or may happen in order to safely run their trains to their points of destination. You can readily read in their grave and care-worn

faces while on duty the great mental strain and responsibility resting upon their shoulders. They know not what moment their train may collide with another, or be derailed and precipitated down some embankment, or be overtaken by some other catastrophe which may deal death and destruction to them and to those intrusted to their care. This is not an imaginary dread on their part, for we scarcely pick up a paper but what we read an account of just some such accident.

(e). There is another false element assumed in this so-called humane doctrine, but never stated. It assumes that those in charge of the trains are inhuman for not preventing the injury when they have the means at hand with which it could have been done, and because it was not done the company must pay for their inhuman conduct. This rule cuts deeper than the law of negligence. If those in charge of the train were only guilty of negligence, then the company would not be liable for the injury inflicted, for the reason that the plaintiff's contributory negligence would prevent a recovery; but under this rule, because of the inhuman conduct of the employees, the law of contributory negligence is by the courts suspended in favor of the plaintiff. In other words, the conduct of the trainmen is so inhuman that the company will "not be heard to say that plaintiff was also guilty of negligence which contributed to the injury." [Kellny v. Railroad, 101 Mo. 67; Morgan v. Railroad, supra.] And in all cases like this it should be borne in mind that the plaintiff is not only confessedly guilty of contributory negligence but he is also a wrongdoer, and he must plead his own negligence in order to invoke this doctrine. [Krehmeyer v. Transit Co., decided by this court in Banc, 220 Mo. 639.]

This is an unjust charge made against these employees. My observation and experience have taught me that they do not wantonly and willfully injure and kill their fellowman. As a class they are men of good

sense, sound judgment and possess noble instincts; they are fairly well educated, experienced and skilled workmen; they are kind-hearted, temperate, humane and charitable to a fault; they lead the lives of good citizens and are prompted to action by noble impulses; and because of those good qualities, coupled with their courage and true devotion to duty, they are employed to turn the wheels of commerce, distributing the surplus products and commodities of the country, and transporting the traveling public from place to place. These important duties are not entrusted to the hands and conscience of men who wantonly and recklessly take the lives of their fellowman. I refer to these matters for the purpose of showing how absolutely baseless is the claim, that railroad companies are held liable in this class of cases on account of the inhuman conduct of their employees, notwithstanding the contributory negligence of the trespasser. Such assertion is not only unfounded, but every intelligent observing man knows that it is not true. Who can point his finger to such a man or can point to such a case? I personally know many trainmen, including engineers, firemen and conductors, and none such exists among them. There is no better class of citizens in the country. They are honest, upright, hardworking men, facing the perils of transportation in the performance of their duties to the public in order to make an honest living. When we look at this great army of men as they really are, the work they are doing, the business entrusted to their care, and the lives they are leading, we can but wonder how it was ever possible for the courts to conceive the idea that the conduct of these men was not only negligence, standing upon the same basis with contributory negligence, where the common law has always placed it, but was so much more culpable and base in character as to cause the courts to turn a deaf ear to the plea of contributory negligence, which is venerable with age, yea, as old as our jurisprudence

itself. Whoever heard of such a flimsy pretext improvised to excuse a man from the consequence of his own wrong and negligence? And how devoid of all merit it is, especially when we consider the fact that the person to whom clemency is thus extended is confessedly a trespasser and wrongdoer, while those in charge of the train are where they should be, performing their duties, where only they can be performed. Such clemency places a premium upon wrong-doing and penalizes good citizenship, and throws continuous obstructions in the way of those who are trying to live lives of usefulness and perform their duty to the public. Why should the courts suspend the law of contributory negligence on the part of the trespasser and enforce the law of negligence against the company? There might be some excuse for that rule where the trespasser's perilous position is seen by the engineer or fireman, and knowingly run their train against him, but experience and common knowledge teach us that there is not one case in a thousand, if ever, where the engineer and fireman knowingly run over a person. Such injuries almost invariably occur in one of three ways: First, as the result of failure to look for the presence of persons upon the track while they themselves are busily engaged in the performance of their duties to the train and passengers who are entrusted to their care, which, however, is no worse than the contributory negligence of the trespasser upon the track, and not as bad for that matter, for the reason the latter is in a place where he has no legal or moral right to be, while the former are where they should be, in the performance of their important duties; second, where the employees honestly believe the trespasser will leave the track in time to avoid being injured, but fails to indicate an intention to the contrary until it is too late for them to stop the train or otherwise avert the injury; and, third, where they mistake the person of the trespasser upon the track for some animal or inanimate ob-

ject, and do not discover their mistake until it is too late to prevent the injury. In addition to these, there are several known instances where despondents are known to have committed suicide by throwing themselves in front of approaching trains, and, if the truth were known, I dare say there are many more who have ended their lives in the same way, and the railroad companies have been held liable therefor.

But regardless of the cause of death, this co-called humanitarian doctrine when applied to this class of cases may be likened unto charity in that it covers a multitude of sins and authorizes a recovery in almost every conceivable case, but is differentiated from charity in that the latter is one of the cardinal virtues, while the former is not only destitute of all merit but it reeks in fraud, perjury and oppression.

(f). My long experience upon the bench and close observation of the numerous cases which I have tried of this class have thoroughly convinced me that this so-called humanitarian doctrine has opened wider the door to fraud and perjury than any policy adopted by the courts since the enactment of the Statute of Frauds and Perjuries. This seems to be the consensus of opinion among disinterested members of the bar and of many leading and able jurists of the country.

(g). Another great evil and living menace to the whole country has grown up with and out of this ruling of the courts, that is, the extension of the right of pedestrians to walk upon and over all portions of railroad tracks.

I refer to the tramp, hobo and yeggman. Prior to this ruling the tramp and his pals were unknown and unheard of. They appeared with the evolution of that doctrine, and since its full development they, like the poor, are with us always. He is as much the direct product of that doctrine as the lily of the field is the product of the soil, rain and sunshine. Without that

holding and without the right to walk upon and along railroad tracks the tramp could no more exist in this country than the lily could without the elements before mentioned. In the first place, during bad and stormy weather he would have no dry and smooth roads upon which to walk from one town to another, such as the railroad tracks are; nor would he have the same shelter and protection from rain, storm and winter blast that he now has in the depots, box cars, bridges and culverts, nor places of that character in which to sleep; nor the hospitable wife of the section boss and other people living along the line of the road to give him meat and drink; nor lumber, ties and bridge timbers to burn when he is cold; and last, but not least, an ever-waiting carriage to convey him free of charge to any and all parts of the country, as he now has, by concealing himself in a box car, in the "blind baggage" or upon other portions of the train.

Does anyone suppose for a moment that railroad companies would tolerate this tramp business with all of its attending evils if the law denounced it as a crime, and if they had the right to exclude them from their tracks and other property? Certainly not, no more than the farmers living along the public highways of the country would tolerate them, with their thievery, robbery and arson. Should the railroads ever become so fortunate as to acquire the legal right to arrest and exclude the tramp and other trespassers from their properties without being subjected to the payment of damages for false imprisonment, malicious prosecutions and personal injuries, etc., then upon that day we would witness the beginning of the end of the tramp in this country. With this exit from the roads, he would be forced into the various fields of industry and there required to earn an honest living by the sweat of his brow; many of whom would become good and useful citizens. Not only that, their departure would also witness a cessation of nu-

merous crimes that are now laid at his door. Box car robberies would become a thing of the past. The burning of ties, depots, lumber, bridge timbers and railroad bridges would continue no longer. With his departure would also go the bank robber and safe blower, as well as the postoffice and mail robber. If the tramp and yeggman should be excluded from trespassing upon the railroads of the country, it would be but a short time until they would learn to their sorrow that they could not commit those crimes and escape capture over the railroads any more than they could over the country roads and highways. The same swift and certain justice would overtake and be meted out to them that is now measured out to all who commit crime and try to escape in that way; but under this rule any criminal may return to the railroad and leave the country upon a hand-car or the first passing freight train, fearing no molestation whatever from the trainmen should he be discovered with the car or detected in his hiding place upon the train; but not so if he were conscious of the fact that he would be arrested, detained and prosecuted if found trespassing upon railroad property in the same manner that he would be if found trespassing in a private dwelling or upon any other private property.

All of these great evils have grown up in recent years under the so-called humanitarian doctrine, and if the statute in question was enforced it would be impossible for any of them to longer exist; but under that rule they are constantly on the increase, as is conclusively shown by the records of this and other courts of this and other States.

This rule is of recent origin and is a judge-made law, pure and simple, and like most of them results in more evil than good. For every meritorious case compensated for by it, fifty others are induced thereby to go into places of danger, and are injured as a result thereof.

(h).   This case shows how absolutely unjust and intolerable this rule has become.   It protects the drunken trespasser, lying asleep upon the railroad tracks, obstructs commerce and travel, and subjects the company to the payment of $8000, together with interest and costs, for injuring him while lawfully running its train upon its own tracks, where it has a right to be, and could be nowhere else.   I have often wondered why the courts did not also extend the measure of damages in such cases so as to compensate such poor unfortunates for the disturbance of their sleep, as well as for the personal injuries inflicted under such circumstances, for they are as much entitled to the one as the other; and the time is not far distant, I dare say, when the courts will require the company to furnish beds, electric fans, ice water and mint juleps to all who imbibe too freely, and who wish to sleep off their stupor upon the tracks of the great arteries of commerce. What are we coming to?   What an absurdity and travesty upon justice this is?   If it was not for the seriousness of this question to the railroads of the country, to the public at large and to the commercial interests generally, it would be highly grotesque; but its seriousness robs it of its grotesqueness and causes us to contemplate with alarm the results of a rule that holds a railroad company liable among other things for injuries done to a drunken man lying asleep upon its tracks.   It is shocking to every instinct of right, justice and morality.   If the engineer should knowingly or wilfully run his train over such a person he would richly deserve criminal prosecution and punishment, but in the name of conscience why should the company be made to pay for such injury?   Why, this court has even held that drunkenness was no excuse or defense in a criminal prosecution for murder (State v. Snell, 78 Mo. 240), yet it is solemnly adjudicated by the same court that drunkenness is an excuse for being asleep

228 Sup—9

upon the tracks of a railroad company, and that the
law should excuse his intoxication and overlook his
sleeping upon the tracks, suspend the law of contribu-
tory negligence and hold the company liable in dam-
ages for having run over him, while in that sleepy and
drunken condition. What a farce! What an outrage,
and what a mockery and travesty upon justice is such
a holding! No authority has been, cited in support
thereof, and I have searched the reports of both Eng-
land and America and have found no, case which lends
color to such a travesty.

Judge Thompson in treating this question in his
excellent work on negligence used this language: "A
person who lies down and goes to sleep upon a rail-
road track, although no train is in sight at the time,
expecting any train that may approach to stop until
he wakes up, or to get off the track and go around him,
or in some way to climb over him without hurting him,
generally receives even less favor from the courts.
This is contributory negligence *per se;* and if he is
killed, not willfully, wantonly or intentionally, his mis-
conduct will not be allowed to be made the ground of
recovering damages from the railway company."
[Thompson on Negligence, sec. 1791.]

And especially should this be the rule under sec-
tion 1105, Revised Statutes 1899, which declares all
persons who walk upon the tracks who are not employ-
ed by or otherwise connected with the road to be tres-
passers. If there ever was a case where one should be
considered a trespasser under this section, it seems
to me that Fletcher was that person. The rule is un-
just, violative of the statute, and vicious in the ex-
treme, and should be no longer followed, in my judg-
ment.

II. But even under the so-called humane rule,
the plaintiff, in my judgment, should be denied a recov-
ery in this case.

In the case of Frye v. St. Louis, I. M. & S. Ry. Co., 200 Mo. 377, the doctrine is stated as follows: "In such a case, out of tenderness and regard for limb and life, it has been held that where the general public have been invited to use the track by the tacit consent and long acquiescence of a railroad company in permitting open, known, free, continuous and extensive use thereof by footmen, then it owes a duty to such footmen to use ordinary care to look out for them and ordinary care to protect them from being run down and maimed or killed."

The same doctrine was announced in the case of Ayers v. Wabash R. R. Co., 190 Mo. 228 (and quoted approvingly in the late case of Minnie Trigg v. Water, Light and Transit Company, 215 Mo. 521) in this language: "The evidence showed that, although this occurred on defendant's right of way, and where there was no public crossing, yet it was where the defendant knew that the public was in the habit of using the railroad track for a footpath, and, therefore, it was the duty of the engineer to be on the lookout for persons so using the track."

Under the rule thus announced, I am clearly of the opinion that the engineer in charge of the train was not in duty-bound to keep a lookout for the deceased, who was sitting at the time of his injury on the east end of a cross-tie and leaning over with his elbow resting upon the rail and his head resting in his hand.

In the Frye case, at page 401, the court said: "Did plaintiff bring himself within the doctrine of the rule announced in paragraph 2 of this opinion? That is, was the place he was struck a place defendant was entitled to a clear track, but had no right to expect one? To bring a case within that rule, the use established in the public may be likened somewhat to that giving rise to a prescriptive right, i. e., the use must be a known use and must be confined to the limits proved." In that case the evidence showed that the

public was accustomed to walking on the track in question in the daytime but that only a few ''thirsty denizens of Mill Springs, who, having dry whistles and parched gullets, wet them at Leeper's saloon,'' walked on the track in the night. In that case plaintiff was run down by a train at night while walking upon the track; and the court held that the engineer was under no legal obligation to keep a lookout for him or other persons at that time of night, and for that reason denied a recovery. Continuing, the court said: ''The case is barren of testimony bringing home notice to the employees, agents and officers of defendant of such use of their track by night-brawlers and tipplers; acquiescence, in the very nature of things, assumes a prior knowledge—the one cannot exist without the other.''

The rule there announced is applicable here. The evidence in this case showed that pedestrians were in the habit of walking upon the track between the rails and nowhere else; nor was any other use of the track shown, consequently appellant could not have acquiesced in any other use. Fletcher at the time of the injury was not walking upon the track, as the evidence showed the public had been doing, but he was sitting on the end of a tie and leaning over on the east rail, as before stated. This use deceased was making of the track was not of the character made of it by the public, nor did it fall within the limits of the use or license proved.

In the Ayers case, supra, the plaintiff was also in a state of intoxication and sat down upon the end of a tie and lay down upon the rail at a point where the public used the track as a footpath, and while in that position he was struck by a passing train and injured. In discussing that case, the court said: ''The evidence showed that, although this occurred on defendant's right of way, and where there was no public crossing, yet it was where the defendant knew that the

public was in the habit of using the railroad for a footpath, and, therefore, it was the duty of the engineer to be on the lookout for persons so using the track. If this man had been walking or standing on the track, he could have been seen by the engineer in time at least for a danger signal to have been given, but lying as he was on the west side of the track, he was not as conspicuous as a person walking or standing would have been. The engineer was not chargeable with notice that a man was liable to be found lying on the track, and therefore, the fact that the engine struck the plaintiff in that position is not in itself sufficient to justify the inference either that the engineer saw him or that he failed to use ordinary care to discover him in time.''

In the case of Minnie Trigg v. Water, Light & Transit Co., the deceased was killed while lying on the east side of an elevated track located in a public street, with his head lying between the east end of two ties. The evidence showed that the public used the track as a footpath. The court said: ''We must, therefore, hold that the uncontradicted evidence shows that the deceased was not using the path mentioned in the evidence when struck, and that there is no evidence that pedestrians or any one else ever used the embankment upon which Mr. Trigg was killed, for any purpose whatever.'' So we may say in the case at bar ''that the uncontradicted evidence shows that the deceased was not using the path mentioned in the evidence when struck, and that there is no evidence that pedestrians or any one else ever used'' the end of the tie and the rail upon which deceased ''was killed, for any purpose whatever.'' The court continued: ''Technically speaking, the deceased had the legal right to be at the point where he was struck and killed, because it was a portion of a public street, which of itself carries with it the legal right to use all portions of the street consistent with the legal uses to which it was at the time

devoted, and for that reason, technically, it was the duty of the servants in charge of the car to have been careful in looking out for all persons who might have been occupying that portion of the street; but when we come to look at the situation from a practical and common sense standpoint, which is the essence of all law, then the duty to have looked was only commensurate with the amount of travel shown to have existed upon that portion of the street at the time the injury occurred. In this case there is not a scintilla of evidence which tends to prove any one ever used that portion of the embankment for any purposes whatever. Defendant, therefore, owed no actual duty to look out for deceased at the place where lying.''

The effect of the rulings announced in these cases is that a person using a railroad track not in accordance with the known usage by the public, and presumably acquiesced in by the company, is clearly a trespasser under the plain provision of said section 1105, and he cannot complain of the employees in charge of the train for failure to discover him.

The correctness of this rule and its application to the facts of those cases are not questioned by counsel for respondent, nor by the majority opinion herein, but they insist that the rule is not applicable to the facts of this case, for the reason that the evidence showed the public had been in the constant use of the track between the rails immediately west of and within three or four feet of where Fletcher was reclining at the time of his injury, and for that reason the engineer should have anticipated the presence of people upon the track at the place mentioned, and for that reason he was in duty-bound to keep a vigilant lookout for pedestrians, and that had he done so, he could and would have seen respondent, who was leaning against the rail, just a few feet east of the line traveled by the public; and that if he had performed that duty then he could not have helped seeing the danger-

ous position in which Fletcher was lying; and if he did not perform that duty to the public, then the company is still liable to respondent for the reason that he would have seen him and could have avoided the injury had he discharged his duty to the public, notwithstanding the fact the deceased was not at a place which the public had been in the habit of using, or had the right to under the license; nor the fact that he was not using that part of the track he was occupying for the same purposes the public had acquired the right to use the other portion mentioned.

That contention is not tenable. The deceased was clearly a trespasser under the provisions of section 1105; and the mere fact the engineer did or did not perform his duty to the public upon the occasion in question did not concern Fletcher, for he was not in the position where he or the public had any right to be, but was clearly outside of and some four feet east of the path which had been traveled by the public. This did not exonerate the latter from the operations of the plain letter of the statute or extend the duty of the engineer to look for a person at a different place upon the roadbed from that used by the public, nor for a person who was using that place for a different purpose than that for which it was being used by the public.

It is not pretended that under this view of the case he was one of the public who was using the track under a license acquired from the company. The company never assented, by acquiescence or otherwise, to Fletcher's lying down and sleeping on the side of the track, and while so doing he was not one of the public who was using the right of way as a footpath with the knowledge and acquiescence of the company. He was a trespasser while lying there. He was not using the pathway along the railroad track as the public had been doing in going to and from the business portion of the city, but was reclining some four feet east

thereof in a drunken stupor. There is no evidence contained in this record which tends to show that the public, or anyone else for that matter, ever used this part of the roadbed for sleeping ground, or for any other purpose prior to this injury. Consequently, under the rule announced in the Frye case, supra, there could be no acquiescence in such use on the part of the railroad company, for in the language of that case "acquiescence in the very nature of things assumes a prior knowledge—the one cannot exist without the other."

A license is granted by agreement expressed or implied, and where there is no express agreement, as in this case, and the license is the result of a use long acquiesced in and therefore presumably assented to, the license does not extend beyond the limits of the use shown, either in extent or character. In the case at bar, the extent and character of the use proven was for pedestrians to pass along the track in a narrow path in the center of the track while going to and returning from the business portion of the city. Counsel for respondent, however, seek to extend this license further than a mere line of travel, and make it applicable to a person who is not using the track for the purpose so licensed, but who was using a different portion thereof for a different and distinct purpose, and contend that this person has the same rights as do the persons who are within the license. Such is not the law. The defendant according to this doctrine was under legal obligation to anticipate and look out for persons who might be walking along the track at the place mentioned. This duty arose out of the fact that persons were in the habit of using the track with defendant's acquiescence, but it does not follow that because the defendant was bound to anticipate and look for persons so using the track it was also required to anticipate and look for a person who might be lying asleep on the dump east of the track. The license

given to the public did not extend so far as to author-
ize a person to so use the track. Consequently, the extent
of defendant's duty was to look for persons who were
exercising the right given to them under the license.

Whatever imaginary breach of duty the engineer
may have been guilty of toward the public did not con-
cern Fletcher so long as he was not embraced within
the purview of the license, as before stated. He was
not in the path between the rails, where the public had
acquired the right to pass. Before respondent could
avail himself of the license acquired by the public to
the use of the path, the burden was upon him to show
that Fletcher at the time of the injury was within the
limits of the use proved, but, having failed to do so,
he is not entitled to a recovery, for the reason that all
persons who were outside of the limits the use shows
were trespassers under said section of the statute, and
nothing except the license in question could under the
cases before considered exempt them from its opera-
tion, and as he was not within the limits of the license
the rule is unavailing to him.

In considering this same question, the Court of
Civil Appeals of Texas in the case of the M., K. & T.
Ry. Co., 29 Tex. Civ. App. 156, said: "If appellant
knew that deceased was on the track, engaged in work-
ing with the coupler, it owed him the duty of warning
him of the intention to move the car, but if it did not
know that he was on the track, it owed him no duty. It
is true that it was in proof that it was customary for
pedestrians to use any part of the yard in crossing
the track, and whilst such use without protest may
have given a license to parties to cross the tracks at
any point, and may have devolved on the railway com-
panies using the tracks the exercise of care towards
such pedestrians, it did not create any duty towards
those who were using the track, not for the purpose
of crossing it, but for the examination of the appli-
ances of cars standing on the track. Deceased was not

at a crossing when killed, and was not in the act of crossing the track, but was engaged in gratifying an idle curiosity in regard to an appliance of the flat car. The license to deceased was to use any part of the yard for the purpose of crossing the railroad tracks, and for that purpose alone, and only while using the yard with that object in view did the duty to him exist that is incumbent upon a railroad company in case of a license. The license to use the tracks for passage from one part of the town to the other was one that is established by the fact that the public had been making such use of them for a number of years, and such use had tacitly been acquiesced in by appellant. It was not shown to be a custom, however, for persons in their passage across the tracks to stop and spend an appreciable length of time in examining and experimenting with the appliances of cars. In so acting, deceased was a trespasser, pure and simple, and the evidence failed to establish negligence, whether looked at from the standpoint of appellant's duty, or from that of the contributory negligence of deceased. There is no testimony tending to show that the railroad employees had any knowledge of deceased upon the track. In the case of Kelly v. Railroad, 65 Mich. 186, it was said by the Supreme Court of Michigan: 'The highway crossing is for the purpose of passage from one side of the railroad to the other, and any other use thereof, whether between the tracks or between the rails, is unwarranted.' The presence of deceased upon the track was not because of the fact that any part of the tracks in the yard was used as a passageway, but he was there on other grounds totally disconnected with a passage over the track. As said by the Supreme Court of Ohio in Railroad v. Marsh, 63 Ohio St. 236: 'His rights and the liabilities of the railroad company would have been the same if the track of the railroad company had never been used as a line of travel, or if the injury had occurred while

the boy was going to the switchstand south of the highway, where the railroad was not used as a line of travel, so far as appears in this case.' The principle is the same as that held in Kelley v. Columbus, 41 Ohio St. 263, where the court says: 'If there had been a business room in the building, or upon another part of the lot, which would have been an implied invitation to the public to go there, it still would not help the plaintiff, when he admits that he did not go upon the lot for any such purpose.' There is some conflict of authority as to who may claim the benefit of statutory signals, but it is usually held that where the statute does not specifically name the class of persons to whom the duty is owing, it is due only to those who are about to use, are using, or have lately used the crossing, and it has been held that no others could recover for injuries resulting from a failure to give the signals. In the case of Harty v. Railroad, 42 N. Y. 469, the plaintiff was at a place where he was licensed to go, not a great distance from a street crossing, and it was held that statutes requiring signals to be given on approaching crossings had for their sole object the protection of persons traveling upon the highway at or near the crossing. It was said: 'If this company was bound to give these warnings to this man, then every railroad company is bound to do so to every person who may be upon the railroad, ahead of a train, although he is not on the track, and not in a place of danger.' Other authorities supporting this proposition are cited in note to Elliott on Railroads, p. 1757, sec. 1158. To the same effect is Hoover v. Railroad, 61 Tex. 503.''

Besides this, Fletcher was not induced to sit down upon the end of the tie mentioned in the evidence, nor to lean over against the rail and go to sleep because the track between the rails had been used for years as a place of travel by the public, but was due doubtless to his drunken stupor, and to the same may be

attributed his failure to heed the warning given to him by the old negro woman before mentioned.

In the case of Railroad v. Marsh, 63 Ohio St. 236, the evidence showed that the public had for years used the track as a footpath; that plaintiff, a boy, not an employee of the company, was requested by the station agent to light a lamp at the south stand; that the boy was injured on the track performing that errand. The court said: "His being upon the track at that time was not induced by the fact that the track had been used for years as a line of travel by the public, but by reason of his engagement to light the lamps; his rights and the liabilities of the railroad company would have been the same if the track of the railroad company had never been used as a line of travel, or if the injury had occurred while the boy was going to the switchstand south of the highway, where the railroad was not used as a line of travel, so far as appears in this case."

The reasoning of those cases applies equally well to the facts of this case, and it may be said in almost the identical language of those cases, that Fletcher's being upon the track was not induced by the fact that the track had been used for years as a line of travel by the public, but by reason of his drunken condition he was induced by his stupefaction to stagger down the track, and lie down on the east side of the embankment and go to sleep; his rights and the liabilities of the railroad company would have been the same if the tracks of the railroad company had never been used as a line of travel, or if the injury had occurred while Fletcher was lying at a point south of the place where the path in question terminated.

For the reasons above stated we are of the opinion that the trial court erred in refusing instructions numbered five and seven asked by appellant, which in effect told the jury that if they found from the evidence that Fletcher was not standing or walking along the

path between the rails just before and at the time he was struck and killed but was sitting or lying down east of the rails, then they would find for defendant.

So viewing this case from any legal standpoint you may, there is no known rule of law which will permit a recovery against the company.

III. Counsel for respondent next insists that the employees in charge of the train actually saw Fletcher before he was struck and in time to have averted the injury had they exercised ordinary care in that regard, and having failed to do so the company is liable.

I am unable to lend my assent to that insistence. There is not a scintilla of evidence contained in this record tending to show that any one connected with the train saw him until just about the time of that collision, which was too late to prevent it.

The mere fact that he could have been seen by the engineer and fireman had they been looking is no evidence that they actually saw him. Every day in the year while walking along the streets of the city we could have seen certain persons, wagons and teams or other objects thereon had we been looking for them, yet we know that there are hundreds of persons, wagons and trains and other objects upon the streets daily which we never see while passing along the same. The ability to see is a fact or circumstance which should be taken in connection with the other facts and circumstances in determining whether or not he was seen by them, but that fact standing alone is insufficient for that purpose. Instead of the other facts and circumstances contained in this record tending to show he was so seen by them they point clearly to the contrary, and tend strongly to show they did not see him until it was too late to avoid the collision. The bell was not rung, the whistle sounded, nor was the speed of the train slackened until just about the time he was struck by the engine. At that instant the air-brakes

and other emergency appliances were applied, thereby clearly indicating they did not knowingly and wantonly injure him, otherwise the appliances would not have been applied, but the train would have been permitted to strike him going at full speed. And as is well stated by counsel for appellant in his printed argument by way of illustration: "If we were to observe a person driving a vehicle along the highway upon which an infant was playing and should see the driver, just as his horses tramped upon the infant, jerk them and arrest their progress, we would naturally conclude that the driver did not see the infant until the instant he arrested the progress of his horses. Persons would not disagree as to the significance of the conduct of the driver under the circumstances." This illustration may be applied to the engineer in the case at bar. He placed the air in emergency and arrested the progress of his engine just about the time of the collision, from which we submit all reasonable minds must infer that he did not before observe deceased.

Learned counsel contend that an inference may properly be drawn that the engineer saw deceased in time to rescue him, from the circumstance that it was the duty of the engineer to look at the signal on the switchstand. The signal on the switchstand was about seven feet high and about the same distance east of the east rail. The train was approaching at about 20 miles an hour. Common experience teaches that the vision of an engineer in keeping a lookout a sufficient distance ahead of his train travels with the train. A sweep of the engineer's vision would have disclosed that no one was walking on the track. It would have been natural if he looked at the signal for him to have immediately observed the Scott street crossing, which was only about 250 feet north of the switchstand. The fact that he observed this signal on the switchstand, if he did observe it, would show that his vision was withdrawn from the rails and ties, and would explain

why he did not see deceased, rather than that he had an opportunity to see him. Not anticipating, nor having any reason to apprehend the presence of one lying asleep upon the embankment east of the rails, would naturally have caused the engineer and fireman to overlook or fail to distinguish one lying there from a dog or other animal, even though he had been seen by them. They would naturally be looking for persons standing up and walking along the track in the place where it was their duty to look for persons and where they had been in the habit of walking, and where they would, on that account, have reason to expect them to be, and not for a person lying asleep at a different place. With one sweep of the eye he could have observed that no one was walking on the track and at the same time observe the signal, and that no one was on or approaching the Scott street crossing.

I am, therefore, clearly of the opinion that Fletcher was not seen by the engineer and fireman in time to have prevented the injury, and, consequently, they did not knowingly and willfully run him down. If negligent at all, it was in not seeing him had they looked, but, as shown in a previous paragraph, that would not render the company liable in this case, for the reason that they were under no legal obligation to look for him at the place where he was lying; but even if they were, as before shown, Fletcher's criminal exposure of himself to sure and almost instant death would offset and neutralize the negligent omission of the employees to see him in his perilous position. There is no law, reason or justice which requires or demands that Fletcher's negligent act of commission, who was a trespasser and wrong-doer, should be overlooked, and that the law of contributory negligence should be suspended and not considered by the courts, simply because the engineer and fireman were at most only guilty of an act of omission, which ordinarily, and especially in this case, is not so

gross an act of negligence as is one of commission.

In discussing a similar question the Supreme Court of the United States in the case of Continental Improvement Co. v. Stead, 95 U. S. 161, 164, said: "Those who are crossing a railroad track are bound to exercise ordinary care and diligence to ascertain whether a train is approaching. They have, indeed, the greatest incentives to caution, for their lives are in imminent danger if collision happen. . . . But notwithstanding the hazard, the infirmity of the human mind in ordinary men is such that they often do manifest a degree of negligence and temerity entirely inconsistent with the care and prudence which is required of them—such, namely, as an ordinarily prudent man would exercise under the circumstances. When such is the case, they cannot obtain reparation for their injuries, even though the railroad company be in fault. They are the authors of their own misfortune. These propositions are so indisputable, that they need no reference to authorities to support them. . . . Both parties are charged with the mutual duty of keeping a careful lookout for danger; and the degree of diligence to be exercised on either side is such as a prudent man would exercise under the circumstances of the case in endeavoring fairly to perform his duty."

If either of these negligent acts should be overlooked and excused, then in the name of justice and right reasoning I submit that the act of the engineer and not that of Fletcher should be excused. Clearly the latter's is the more serious and inexcusable of the two. He was not only where he had no legal or moral right to be, but he deliberately became intoxicated and went and lay down on the side of the track and fell asleep, where he was morally certain that he would meet his death. As before stated, to permit a recovery in this case is but to reward wrong-doing and intemperance, and to encourage negligence and trespass in

its most damaging and hideous form; while, upon the other hand, it would penalize legitimate business, stagnate commerce, and mulct the railroads of the country in damages extending into the millions of dollars every year, and that too without any corresponding benefit being conferred upon any one. In fact this doctrine is as detrimental to the trespasser as it is to the railroad, if not more so. I would like for some one to give me a valid reason for upholding a rule of conduct which results annually in the injury and death of thousands of men, and which at the same time entails millions of dollars of loss and damage to property every year. If there ever was a case on earth where justice, morality and sound reason demand the enforcement of the law of contributory negligence, then this is that case.

I am, therefore, clearly of the opinion that for the reasons stated in the foregoing paragraphs the demurrer offered to the evidence should have been sustained.

IV. Counsel for appellant assail the soundness of the law as declared to the jury by instruction numbered one, asked and given at the request of respondent, for several reasons, which I will now consider.

(a). The first objection urged against that instruction challenges its correctness for the reason that after purporting to present the entire case to the jury it wound up by telling the jury that they would find for plaintiff "although you may further believe that said Luke Fletcher was guilty of negligence in going upon defendant's track."

In my judgment this was an erroneous statement of the law applicable to the facts of the case. Even conceding, for the sake of the argument, that the case should not have been taken from the jury (and I am now going to consider the case from that view) on the

228 Sup—10

demurrer to the evidence, still it cannot be seriously contended but what there was an abundance of evidence which tended to show that the engineer and fireman in charge of the train did not actually see Fletcher prior to the instant he was struck. Under that evidence the jury would have been fully justified in finding that they never saw him until just about the time he was struck, which was too late for them to avert the injury, and did not therefore knowingly and willfully injure him. If they should have so found, then the only other negligent act shown, according to plaintiff's own theory of the case, on the part of the engineer and fireman, as disclosed by this record, was their failure to discover him in time to have avoided the injury. Under this contention of plaintiff the engineer and fireman were negligent in not discovering Fletcher's perilous position in time to have saved him when by the exercise of ordinary care they might have done so. This was not an act of commission, showing willful and inhuman conduct upon their part, but was purely a negligent act of omission in failing to look for him when they should have done so. Upon the other hand, we find Mr. Fletcher, an old-time railroad man, perfectly cognizant of the dangers incident to the operation of railroads, deliberately going out and getting drunk and lying down and going to sleep upon or so near the track as to be inevitably struck and killed by the first passing train. These negligent acts of his, acts of commission, were more gross and inexcusable than was the mere failure of the engineer and fireman to discover him in his perilous position. If their conduct was negligence, then his was criminal. For illustration, suppose we reverse the facts of the case, and suppose Fletcher had been carelessly walking along one of the streets of the city, where he had a perfect legal right to be, near the switchstand mentioned in the evidence, not looking or paying any attention to his own personal safety or to that of

others, and the engineer had become intoxicated, gone and opened the switch and had run his engine off of the end of the switch and killed Fletcher while he was unmindful of his own safety, and had negligently failed and omitted to discover the approaching engine, which he could have done by the exercise of the slightest degree of care but failed to do so, would it be seriously contended for one moment in a suit to recover damages for his death that the criminal conduct of the engineer in so becoming drunk, opening the switch and running his engine into the street and killing Fletcher, should be overlooked and excused by the courts simply because the latter had negligently omitted to see the approaching engine in time to have stepped from in front of it, and thereby have avoided the injury. I apprehend not, yet in principle that is exactly what counsel are asking this court to do in this case. There is not a whit of difference in principle between this case and the one supposed, except the law of the land imposes a much higher duty upon a man to look out for his own safety than it does upon one person to care for the safety of another. [Continental Improvement Co. v. Stead, supra.]

The law of negligence in the supposed case should no more be overlooked or suspended than should the law of contributory negligence in the case at bar. If Fletcher had been sober and at a place where he had a right to be, as were the engineer and fireman, then this injury could not have happened. His contributory negligence was simultaneous with the negligence of the company and continues down to the time of his injury.

For the reason stated, in my opinion, this objection was well taken, and that part of the instruction before quoted should have been omitted, and the jury should have been permitted to have passed upon respondent's contributory negligence.

(b). It is next insisted that said instruction is erroneous because it imposed upon the operators of the train the duty of stopping the same under the circumstances stated therein without requiring the jury to find that such stop could have been made with safety to the train and the passengers thereon. This was error. The law does not require that the train should be stopped within a given time or space, if by so doing it would jeopardize the safety of the train and the lives of the passengers thereon; and whether it would have done so in this case was a question which should have been submitted to the jury. [Bell v. Railroad, 86 Mo. 599, 608, and 72 Mo. 50, 1. c. 60.]

(c). It is also claimed said instruction is erroneous for the reason that it does not require the jury to find that deceased at the time of the injury was occupying the position covered by the license to the public to use the track as a passageway. This omission was also erroneous. [Frye v. Railroad, supra; Trigg v. Water, Light & Transit Co., supra; Railroad v. Cowles, supra.]

V. Instruction numbered two given on behalf of respondent is assailed because it is not applicable to the facts of this case, in that it applies to persons using the track as a passageway and not to persons using a different portion thereof for a resting or sleeping place. This objection is also well taken, for the reason stated in paragraph three of this opinion. See also Walsh v. Railroad, 145 N. Y. 301.

VI. Counsel for appellant complain of the action of the court in refusing to give instruction numbered six, asked by them. In substance it told the jury that Fletcher's negligence precluded a recovery in this case.

This instruction presents the counter-proposition to be that contained in that part of respondent's first instruction, referred to by their first objection thereto. What we there said regarding that question fully covers

the proposition presented by this instruction; and the reasons there given why the court should have refused that part of that instruction convict the trial court of error for refusing to give this one.

But we might add in this connection, that this court in the case of Zumault v. Railroad, 175 Mo. 288, 1. c. 311, in speaking through Judge Burgess, with whom all concurred, said:

"It is asserted by defendants that plaintiff was guilty of contributory negligence. Contributory negligence is defined as 'a want of ordinary care upon the part of a person injured by the actionable negligence of another, combining and concurring with that negligence, and contributing to the injury as a proximate cause thereof, without which the injury would not have occurred.' [7 Am. and Eng. Ency. Law (2 Ed.), 371; Montgomery Gas Light Co. v. Railroad, 86 Ala. 372; Moakler v. Railroad, 18 Ore. 189; Woodell v. W. Va. Improvement Co., 38 W. Va. 23.]

" 'If the plaintiff or party injured, by the exercise of ordinary care under the circumstances, might have avoided the consequences of the defendant's negligence, but did not, the case is one of mutual fault, and the law will neither cast all the consequences upon the defendant, nor will it attempt any apportionment thereof.' [Cooley on Torts (2 Ed.), 674.] The law will not permit a recovery where the plaintiff by his own negligence has contributed to produce the injury from which he has suffered. 'And it matters not whether that contribution consists in his participation in the direct cause of the injury, or in his omission of duties which, if performed, would have prevented it. If his fault, whether of omission or commission, has been the proximate cause of the injury, he is without remedy against one also in the wrong.' [Little v. Hackett, 116 U. S. 371.]

"The record discloses that plaintiff, a man of mature years, in possession of all his faculties, with good

eyes and hearing, familiar with the movements of trains, and while momentarily expecting the arrival of one at the station, upon which he intended to take passage, took a position on the platform so near the railroad tracks that a train could not pass without striking him, turned his face to the east when he was expecting a train from the west, and either fell asleep or from some other cause became entirely oblivious to his surroundings, when by looking he could have seen the approaching train, or by listening he could have heard it. If such conduct was not, under the circumstances, contributory negligence then the definition before given is inaccurate, for it clearly falls within it. In fact it is in effect admitted by counsel for plaintiff in his brief, that plaintiff was guilty of negligence in sitting upon the platform in the position he was in when struck, but plaintiff claims that, notwithstanding his negligence, defendant's servants and employees in charge of the train could have avoided injuring him by the use of ordinary care and diligence, such as sounding the danger signals or stopping the train after they saw him, or could have seen him in a perilous position, and [they] having failed to exercise such care and diligence, that he is entitled to recover for the injuries sustained by him by reason thereof.

"There was no evidence tending to show any willful, wanton or reckless disregard of human life on the part of the engineer in charge of the train that caused the injury. The engineer was plaintiff's witness and testified that he was at his post of duty, and keeping a lookout ahead of him. His train did not stop at this station, nor was any train due there at that time which carried passengers, so that he was not expecting any person to be on the platform, having no reason to anticipate their presence there. He testified that the first thing he discovered going to Elmdale was a man sitting on the platform with his head very low between his legs; he was facing the track, and was a

foot or two from the end of the platform; that just about the time he saw him he struck him; was not over ten or fifteen feet from him when he first saw him, maybe not that much; that as soon as he saw him he applied the air; that he did nothing else, because he had no time until the engine struck him; that there was nothing to obstruct his view except plaintiff who was sitting in the shade of the platform; that after he saw the man he could do nothing to stop the cars except to put on the emergency brakes which he did.

"In this case the contributory negligence of the plaintiff is a complete defense to the action, unless the conduct of the servants of the defendants managing the train was characterized by such willful, wanton, or reckless disregard of human life also contributing to his death as that the defendants ought not to be heard to say that the plaintiff was guilty of such negligence. . . .

"In the case at bar it was impossible that the engineer could have prevented the injury after actually discovering the perilous position plaintiff was in, as he used every available means at his command to that end but they proved unavailing. There was nothing in the conduct of the engineer in charge of the train indicative of a willful, reckless or wanton disregard of human life. But, on the other hand, plaintiff, while in full possession of all his faculties, placed himself within the danger line of cars passing along on the railroad track, and sat there evidently oblivious to all surroundings, without even keeping a lookout for approaching trains, until he was struck by the engine in question, and was badly injured. Such conduct can only be characterized as the grossest negligence, which precludes a recovery by plaintiff for damages the result of such conduct."

This case was well considered by that able and distinguished jurist, and is upon all-fours with the case at bar; the differentiating features, if any there

exist between the two cases, are in favor of that case, showing the less merit in this. In that case Zumault was upon the depot platform where he had a right to be. Fletcher in this case was a trespasser, and was at a place where he had no right to be. Zumault was sober but sat down on the platform and fell asleep, and was struck and injured by a passing train. Fletcher was drunk and lay down by the side of the track and was killed by a passing train. Zumault could have been seen by the engineer as far as, and more plainly than, Fletcher could have been seen by him. In that case Zumault, a sober man, was denied a recovery on account of his contributory negligence. If this court should permit Fletcher, a drunken man, to recover in this case under the same facts, it would thereby place a premium of $8000 upon his drunkenness, and at the same time excuse his intemperance and negligence which was clearly incident thereto, notwithstanding the fact that this court has uniformly refused to excuse intoxication and crimes committed by men while in that condition, but has upon the contrary deprived men of their lives and liberty for the commission of crime while in a state of intoxication. [State v. Snell, supra.] The following authorities also lay down the law as it is announced in the Zumault case: Sinclair v. Railroad, 133 Mo. 233; Ayers v. Railroad, 190 Mo. 228; Yarnall v. Railroad, 75 Mo. 575; Vizacchero v. Railroad, 26 R. I. 392; Thompson on Negligence, sec. 1791; Harlan v. Railroad, 64 Mo. 480; Tanner v. Railroad, 161 Mo. 497; Sharp v. Railroad, 161 Mo. 214.

VII. The final reason assigned for a reversal of the judgment in this case is that the verdict and judgment are erroneous because both are general, when there should have been a verdict and judgment upon each count of the petition.

This question has been presented to this court numerous times and we have uniformly held such a

verdict and judgment to be erroneous. In the case of Bricker v. Railroad, 83 Mo. l. c. 393, in passing upon this question, the court said: "When a pleader includes in his statement or petition several causes of action, it is unnecessary for him to repeat allegations which are applicable to them all. It is sufficient that such allegations refer to and are applicable to each count, which might be defective without them. But the court erred in accepting a general verdict on these distinct causes of action. There should have been a separate finding and assessment of damages on each. In no other way can the defendant be advised of the amount of his liability on each cause. An observance of this rule is invariably enforced in this court, when an objection to its breach has been properly saved in the record, as appears in this case. [Mooney v. Kennett, 19 Mo. 551; Clark's Admx. v. Railroad, 36 Mo. 215; Pitts v. Fugate, 41 Mo. 405; State ex rel. v. Dulle, 45 Mo. 269; Bigelow v. Railroad, 48 Mo. 510; Owens v. Railroad, 58 Mo. 386.]"

There are numerous later cases in this court affirming those above cited, but since the law is so well settled regarding this question, a further citation of authorities in support thereof would be supererogation of labor.

The record in this case shows the petition contained two counts—one based upon contract and the other upon a tort, which was an improper joinder of actions, but that point was waived by not making timely objection thereto; but timely objection was presented to the form of the verdict and judgment.

I am, therefore, of the opinion that the judgment should be reversed.